PRESENT:   All the Justices

KELIS ALLEN HAMILTON

OPINION BY
v.    Record No. 090069        JUSTICE CYNTHIA D. KINSER
                               JANUARY 15, 2010
COMMONWEALTH OF VIRGINIA

FROM THE COURT OF APPEALS OF VIRGINIA

Kelis Allen Hamilton was convicted by jury trial in the Circuit Court of Augusta County of three counts of assault and battery by a mob in violation of Code § 18.2-42 and one count of participating in a criminal street gang in violation of Code § 18.2-46.2.  Because we conclude that the evidence was sufficient to sustain these convictions, we will affirm the judgment of the Court of Appeals of Virginia.

I.   FACTS AND PROCEEDINGS[1]

The convictions challenged on appeal arose out of a party in August 2006 at Garrett Johnston's 110-acre farm located in Augusta County.  The assault and battery convictions involve three separate victims: Zachary Small, Daniel Payne, and Johnston.  The conviction for participating in a criminal street gang concerns a gang known as the "Nine Trey Bloods" (the Bloods).

---

[1] We will state the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court, and will accord the Commonwealth the benefit of all reasonable inferences fairly drawn from the evidence.  Murphy v. Commonwealth, 264 Va. 568, 571, 570 S.E.2d 836, 837 (2002).

At trial, the Commonwealth called two police officers, Mark Campbell and Christopher Hartless, both of whom qualified as expert witnesses with regard to the Bloods. The experts provided the following information about that gang.

The Bloods wear the color red, while a rival gang known as the "Crips" wear the color blue. The location of the color worn signifies the degree of respect shown to a particular gang. For example, a color worn high on the body, as in a hat, shows great respect. Blood members often wear red hats and many of them wear Boston Red Sox hats because, although black, the hats have the letter "B" in red on the front. In addition, black is a neutral color that, when worn with red, is "used . . . to show affiliation." It is a sign of disrespect to wear blue in a Blood member's presence.

The term "Blood-[a]t" is a "Blood war cry" used to call members of the gang to "converge" and "provide whatever . . . assistance is required." The term "Dip Set" is a reference to a "rap group" whose members are known to be in the Bloods. Hartless opined that the use of those terms during an assault would likely mean that the incident was "gang-involved, gang-related."

The Bloods have several body marks or tattoos associated with membership. One such mark is a "dog paw" or "Trey burn," which is a grouping of three circular marks, burned onto the

skin with a cigarette or some other circular object.  Each burn represents a rape, robbery, or murder, and a Blood member has to commit those crimes before he can get the burns.  To burn a rival gang member in that manner would indicate enormous disrespect.

Neither expert witness testified as to any prior involvement by Hamilton with the Bloods.  Hartless stated that Hamilton did not have any tattoos and, to his knowledge, did not wear any gang-related colors prior to the events at the party.  Campbell acknowledged that the number of Blood members without tattoos would be "rather low" but that it would be consistent with a member who had not performed any work for the gang or who was trying to avoid detection by the police.  Hartless opined that Hamilton was not involved with the Bloods prior to the party.  However, Hartless did opine that a gang assault involving "some people who had never been affiliated with that gang before" could "potential[ly]" be a form of "initiation for one or more of the individuals within that group."

Approximately 400 people attended the party that lasted from ten o'clock in the evening to three o'clock the following morning.  Numerous witnesses testified about consuming alcohol at the party, some admitting that they were intoxicated.  Likewise, several witnesses stated that a number of small

3

fights erupted during the party in addition to the incidents at issue in this case.

At some point in the evening, Johnston noticed a group of individuals that he assumed were members of the Bloods because they all were wearing red bandanas. According to Johnston, the group was "chilling in one section of [a] tent" that Johnston had erected for the party. Johnston approached the individuals and inquired if they were "Bloods," to which they responded, "Yes."

The defendant, Hamilton, admitted at trial that he attended the party. He claimed that he wore a red and black hat, a black and gold shirt, and blue jeans. Hamilton conceded the hat could have been a Boston Red Sox hat. Another party guest, Christopher R. McLaughlin, testified that Hamilton was wearing both a red cap and a red shirt. According to McLaughlin, Hamilton approached him and stated, "You're a Blood and you don't even know it." McLaughlin assumed Hamilton made that statement because McLaughlin was wearing a red baseball cap and a red shirt. McLaughlin responded that he was not "gang-related" and walked away.

According to Johnston, the Bloods were involved in a "big fight" that "blew up" at approximately three o'clock in the morning. Zachary Small, who was wearing a dark blue shirt, knocked over a bottle, began to pick it up and, noticing that

4

it was empty, let it fall to the ground again.  When Small
stood up, a "big guy" standing there hit Small in the face.
Believing his jaw was broken, Small stated, "Hold on
man. . . . It ain't like that."  Small heard someone say, "You
made it like that" and then someone struck him from the side.
Small was battered several more times and eventually "knocked
out."  Small told police that during the assault, he heard
someone say, "We ain't wearing red for nothing."  After the
party, Small discovered that he had suffered cigarette burns
on his back.  Detective Campbell opined that the burn marks on
Small's back could have been the start of a "Trey burn" or a
sign of retaliation for disrespect to the Bloods.

McLaughlin witnessed the assault on Small.  McLaughlin
testified that there was "a scuffle, something about knocking
over a drink or something."  As he began to walk the other
direction, McLaughlin turned and saw "12 kids over top of
. . . Zach" kicking and beating him.  McLaughlin stated that
"[a]ll you could see was red" and that he heard someone
saying, "You don't think we're wearing red for nothing."
McLaughlin did not remember seeing Hamilton in the group of
people assaulting Small.

Donald Stouffer, however, did see Hamilton.  Although
Stouffer did not witness the assault itself, he saw Hamilton
standing over Small while Small was lying on the ground.

According to Stouffer, Hamilton was doing something with his hands around the middle of Small's back but was not rendering assistance to Small. After seeing a picture of the cigarette burns on Small's back, Stouffer assumed Hamilton was putting out a cigarette on Small's back. Stouffer also heard "a big guy," weighing around 400 pounds, yelling "We're not wearing red for the hell of it."

Matthew Howdyshell witnessed the end of the assault on Small. Howdyshell saw Small lying on the ground, trying to get up, and then falling to the ground again. When Small fell to the ground, somebody came up to him yelling "Dip Set" while also kicking him. The man kicking Small was wearing a red shirt.

A witness who testified on behalf of Hamilton, Whitney Randolph, identified Marty Scott[2] as the person who initially assaulted and battered Small. She stated that a fight broke out on top of the hill when Small kicked over a bottle. According to Randolph, Scott asked Small why he had done so and when Small walked off, Scott hit him. Randolph further stated that as Small was lying on the ground, "three or four people jumped on him."

---

[2] Campbell testified that Marty Scott was a second lieutenant in the Bloods.

Hamilton testified on direct examination to seeing "a group of guys all rushing a White male." According to Hamilton, he assisted the host of the party in breaking up that fight. Hamilton stated that he did not know the victim of that particular assault, and it is unclear from his testimony whether that incident was the assault on Small. On cross-examination, however, Hamilton admitted that he recognized Small as the victim of an attack but only after Small was already lying on the ground. Hamilton described the assault that he purportedly helped bring to an end as the "first fight" and stated that the "next fight [was] the last one, which was the big fight . . . on top of the hill."[3] Hamilton provided these details about the "big fight":

> I noticed a – a group of guys just running up on the hill. . . . And the next thing I know, it was like a group of guys just all started arguing back and forth, and I seen [sic] two White males get hit with a tiki torch. And the next thing you know, it was just like a big commotion, a fight just broke out. And at that time, I seen [sic] [Jakari] Hart pull out a nickel-plated pistol and started firing it in the air.

Daniel Payne was one of the individuals struck with a tiki torch. Payne heard what he thought were fireworks. He proceeded up a hill to ask what was going on when someone

---

[3] Randolph also indicated there was a second fight and stated that "when the gun and all that got happening, all that fighting started."

struck him on the side of his face with a tiki torch, which broke. Payne then "went after" the man who hit him, but "froze up" when another individual pointed a gun into his chest and pulled the trigger. Payne heard the gun click but it did not fire. Payne could not identify either of those individuals and also did not remember whether he saw Hamilton at the party. Hamilton, however, admitted seeing Scott snatch the pistol out of Hart's hand and, according to Hamilton, Scott then pointed the gun in the chest of one of the individuals who was hit with the tiki torch.

Hart, who accompanied Hamilton to the party, said he began firing his gun into the air while Hamilton was standing next to him. Hart testified that he handed the gun to Scott, and Hamilton tried to retrieve the gun from Scott, at Hart's direction. Hart admitted previously stating that Hamilton actually had the gun at some point. Scott was then tackled, causing the gun to fly into the air.

Adam Switzer, who went to the party with Payne and witnessed this incident, saw someone fire the gun in the air numerous times prior to its being pointed at Payne. According to Switzer, there were a "lot of people wearing red" at the party, "everybody" was doing hand-signs "like a symbol," and people were saying, "Blood-at." Switzer, however, did not remember seeing Hamilton at the party.

Clement Miller also saw someone strike Payne with the tiki torch. He likewise witnessed an individual hand the gun to another person and say, "Kill that mother-f__ker." The person who took the gun then pointed it into Payne's chest and pulled the trigger. At that point, "it was a big mess" according to Miller, and the person with the gun was tackled.

Johnston was the other individual who was hit with the tiki torch. He testified that the party was going well until about three o'clock in the morning when "a big fight blew up." Johnston stated that this fight was "the one at the end of the night before [the Bloods] left." Johnston believed something happened to upset the group of Bloods. He heard people saying "Blood-at" as if they were "trying to mimic a gun going off." Johnston asked the group what was occurring because he "didn't understand what had happened to . . . make it so extreme." Scott then hit him in the head with a tiki torch. According to Johnston, Scott had broken his hand earlier in the evening and was surrounded by a group of "guys" wearing red bandanas. Johnston did not hear any gunfire and did not recall seeing Hamilton at the party.

Katherine Duncan also saw Scott wielding a stick and heard him threatening people. Duncan testified that Scott was in the midst of a group of people wearing red bandanas and red t-shirts. According to Duncan, Hart was in the group with

Scott.  Duncan testified that Scott struck two people with the stick and "at one blow, the bamboo stick kind of shredded a little bit."  Duncan said that "[s]ome people had tried to go after Marty, and that's when they connected with the stick."

Hamilton moved to strike the evidence both at the close of the Commonwealth's evidence and at the conclusion of all the evidence.  The circuit court overruled the motions.  The jury found Hamilton guilty of all four charges, and the circuit court sentenced Hamilton to a term of five years of incarceration for the felony conviction for participating in a criminal street gang and a total of 24 months of incarceration for the three misdemeanor convictions for assault and battery by a mob.  In an unpublished opinion, the Court of Appeals of Virginia upheld Hamilton's convictions, finding the evidence sufficient to sustain the jury verdict.  Hamilton v. Commonwealth, Rec. No. 1591-07-3, slip op. at 10 (Nov. 4, 2008).  On appeal to this Court, Hamilton again challenges the sufficiency of the evidence to sustain his convictions.

## II.  ANALYSIS

When a defendant challenges on appeal the sufficiency of the evidence to sustain his conviction, this Court "has a duty to examine all the evidence that tends to support the conviction."  Bolden v. Commonwealth, 275 Va. 144, 147, 654 S.E.2d 584, 586 (2008).  Upon reviewing the evidence in the

10

light most favorable to the Commonwealth as the prevailing party in the trial court, we must uphold the conviction unless it is plainly wrong or without evidence to support it. Code § 8.01-680; Tarpley v. Commonwealth, 261 Va. 251, 256, 542 S.E.2d 761, 763 (2001). We will first address the three convictions for assault and battery by a mob and then turn to the conviction for participation in a criminal street gang.

## A. Assault and Battery by Mob

Each of Hamilton's convictions for assault and battery by a mob was pursuant to Code § 18.2-42. That statute states: "Any and every person composing a mob which shall commit a simple assault or battery shall be guilty of a Class 1 misdemeanor." Code § 18.2-42. The term "mob," in relevant part, is defined as "[a]ny collection of people, assembled for the purpose and with the intention of committing an assault or a battery upon any person." Code § 18.2-38. "In order to sustain a conviction of assault or battery by mob under Code § 18.2-42, the evidence must establish that the accused was a member of a mob and that the mob committed simple assault or battery." Commonwealth v. Leal, 265 Va. 142, 146, 574 S.E.2d 285, 288 (2003).

"The statutory definition of a mob requires that the act of assembling be done for a specific purpose and with a specific intent — to commit an assault or a battery." Harrell

11

v. Commonwealth, 11 Va. App. 1, 6, 396 S.E.2d 680, 682 (1990). The act of assembling with that specific purpose and intent distinguishes mob behavior from merely individual behavior while part of a group. Id. at 7, 396 S.E.2d at 683. However, the group need not have originally assembled with such purpose and intent in mind. Rather, "[i]t is possible that individuals who are lawfully assembled may become members of a 'mob' without great deliberation." Id. Whether a group of individuals becomes a "mob" depends upon the circumstances and "no particular words or express agreements are required to effect a change in a group's purpose or intentions." Id. at 7-8, 396 S.E.2d at 683. Once an assembled group becomes a mob under § 18.2-38, "every person composing the mob becomes criminally culpable even though the member may not have actively encouraged, aided, or countenanced the act" of assault or battery. Id. at 8, 396 S.E.2d at 683. Thus, "criminal accountability flows from being a member of the mob, regardless of whether the member aids and abets in the assault and battery." Id.

In challenging his three convictions under Code § 18.2-42, Hamilton first contends that the Commonwealth failed to prove beyond a reasonable doubt that he was a participant in the mob that attacked Small. With regard to the Payne and Johnston attacks, Hamilton argues the evidence was

12

insufficient to establish that either Payne or Johnston was attacked by a mob, and even if they were, that he was a member of such mob.  We will address the convictions in that order.

Hamilton does not dispute, and indeed the evidence overwhelmingly shows, that Small was assaulted by a mob.  That mob was composed of Blood members.  Small recounted getting hit by several individuals and remembered hearing someone say, "We ain't wearing red for nothing."  One witness estimated that approximately 12 people were kicking and beating Small and testified that "[a]ll you could see was red."  During the attack, several witnesses heard people yelling, "We're not wearing red for the hell of it."  Another witness heard someone wearing a red shirt yell "Dip Set" while kicking Small.  Small was rendered unconscious and later became aware that someone had burned his back with a cigarette in the shape of a "Trey burn."  Such a burn, according to the Commonwealth's expert, is a sign of retaliation for disrespecting the Bloods.

Hamilton admitted being in the proximity of the attack on Small and recognizing Small as the victim, but he denied any involvement in the attack.  Stouffer, however, recalled seeing Hamilton standing over Small as Small was lying on the ground. Hamilton, Stouffer stated, had his hands near Small's back and was doing something other than rendering assistance to Small.

13

In light of the burns Small received on his back, the jury could reasonably conclude that Hamilton placed those burns there and was thus a member of the mob that assaulted and battered Small.

Hamilton, however, points to the testimony of McLaughlin and Howdyshell, both of whom did not remember seeing Hamilton in the group of people attacking Small. Hamilton also argues that, based on Stouffer's testimony, it was "equally likely" that he was assisting Small as opposed to placing burns on Small's back. These assertions merely highlight the witnesses' different recollections of the events at the party and the credibility determinations the jury therefore had to make. "The fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." Commonwealth v. Taylor, 256 Va. 514, 518, 506 S.E.2d 312, 314 (1998). On appellate review, we do not substitute our judgment for that of the fact finder. Cable v. Commonwealth, 243 Va. 236, 239, 415 S.E.2d 218, 220 (1992). We conclude the evidence was sufficient to sustain Hamilton's conviction for the assault and battery of Small by a mob; the jury's determination that Hamilton was part of the mob that attacked Small was not

14

plainly wrong or without evidence to support it.  See Code
§ 8.01-680.

With regard to the Payne and Johnston attacks, Hamilton
first asserts there was insufficient evidence to prove that
either Payne or Johnston was assaulted by a mob.  He argues
that the particular person who attacked Payne and Johnston did
so as "[o]ne belligerent individual," Harrell, 11 Va. App. at
11, 396 S.E.2d at 685, and that there was no "collection of
people, assembled for the purpose and with the intention of
committing an assault or battery" upon either victim, Code
§ 18.2-38.  We do not agree.

Payne was hit in the head with a tiki torch when he
approached a group of people, inquiring about "[w]hat sounded
like fireworks."  When Payne "went after" the person who
struck him, someone else pointed a gun into his chest and
pulled the trigger.  According to Switzer, there were "a lot
of people wearing red," "everybody" was doing hand-signs "like
a symbol," and people were saying "Blood-at."  In addition,
Switzer saw one person firing the gun before a different
individual then pointed it at Payne's chest.  Miller, in
addition to seeing someone strike Payne with the tiki torch,
witnessed someone hand a gun to another individual while
saying, "Kill that mother-f__ker."

The presence of Blood members and their use of hand-signs and the "Blood war cry," which is specifically used to call other Bloods to "provide whatever . . . assistance is required," all demonstrate that the Blood members assembled for the purpose and with the intent to assault and batter Payne. Even if the Blood members were lawfully assembled without the intent to commit an assault prior to Payne's entry onto the scene, the use of "Blood-at" and the instruction to "[k]ill that mother-f__ker" show that the group transformed into a "mob" under Code § 18.2-38. Therefore, we conclude the jury's finding that a mob assaulted and battered Payne was not plainly wrong or without evidence to support it. See Code § 8.01-680.

We reach the same conclusion with regard to the attack on Johnston. He approached a group of Bloods who had become so upset about some happening that Johnston characterized the response as "extreme." As he approached the group, Johnston heard people saying "Blood-at" as if they were imitating a "gun going off." Hartless confirmed that the Bloods say "Blood-at" or "Blat" in a way to mimic gunfire. Just as in the Payne attack, people shouted the "Blood war cry" to call their fellow Bloods to provide assistance. Scott, a second lieutenant in the Bloods, then hit Johnston in the head with a tiki torch. According to Johnston, Scott was surrounded by a

16

group of "guys" wearing red bandanas. Duncan also testified that there was a group of individuals around Scott who were wearing red bandanas and red t-shirts and that Scott was threatening people as though he wanted to fight them. Duncan also stated that Scott hit both Payne and Johnston, and Hamilton's own testimony establishes that the two attacks were not isolated incidents. The evidence established that a "collection of people" assembled with the purpose and intent to commit assault or battery and was thus sufficient to prove that Johnston, like Payne, was assaulted and battered by a mob. Code § 18.2-38.

Hamilton contends, however, that even if a mob did assault and batter Payne and Johnston, the Commonwealth failed to prove that he was part of any such mob. Hamilton argues that, because no one testified as to his presence when either Payne or Johnston were attacked, the jury had no basis upon which to conclude that he was a member of any mob that attacked either victim. Hamilton further contends that he could be convicted of these two assaults only if the evidence proved both attacks occurred at the same time and the evidence does not support such a conclusion. We disagree with Hamilton's arguments and conclude that there was sufficient evidence showing that Hamilton was a member of the mob that assaulted both Payne and Johnston.

17

Hamilton's testimony established that the attacks on Payne and Johnston occurred close in time and were committed by the same mob. He described a "first fight" and the "next fight" as "the big fight . . . on top of the hill."[4] Hamilton testified that, in the latter fight, he saw two individuals get hit with the tiki torch and at the same time witnessed Hart "pull out a nickel-plated pistol" and fire it into the air. Hart, who went to the party with Hamilton, said Hamilton was standing next to him when he was firing the gun into the air and that Hamilton tried to get the gun from Scott. Hamilton himself testified that Scott took the gun from Hart, "had some words" with "one of the guys who got hit with the tiki torch," and then put "a gun to [one of] the victim[s'] chest[s]." Both Hart and Hamilton then saw the gun fly into the air when Scott was tackled.

Likewise, other witnesses confirmed that the same mob attacked Payne and Johnston and did so at about the same time. Duncan testified that Scott was seeking to fight people and that he "connected with two people," i.e., battered them, by using the tiki torch. Johnston said "a big fight blew up" around three o'clock in the morning and he was responding to this "big fight" when he was struck with the tiki torch.

_____

[4] Hamilton conceded at oral argument before this Court that the attack on Small occurred first.

18

Randolph stated that the "first [fight]" was when Marty assaulted Small. In response to a question about a "later fight," she described it as "when the gun and all that got happening, all that fighting started."

Witnesses recalled seeing a group of Bloods surrounding Scott when he used the tiki torch to strike Payne and Johnston. In describing the Payne attack, Switzer stated there were "a lot of people wearing red" saying "Blood-at," and doing hand-signs "like a symbol." Johnston also heard people saying "Blood-at" when Scott struck him with the tiki torch. Both Duncan and Johnston described the individuals surrounding Scott as wearing red bandanas.

Finally, evidence showed Hamilton's association with the Bloods at the party. He admitted that he wore a red and black hat that was possibly a Boston Red Sox hat. Hamilton also stated to McLaughlin, "You're a Blood and you don't even know it." Hamilton and Hart came to the party together, Hamilton was standing next to Hart when Hart was firing the gun that was eventually pointed at Payne, and Duncan placed Hart in the group surrounding Scott.

Based on this evidence, we conclude that Hamilton was a "person composing" the mob that assembled for the purpose and with the intent to assault or batter Payne and Johnston. Code § 18.2-42. "Compose" means to "form the substance of:

19

constitute." Webster's *Third New International Dictionary* 466 (1993). As a part of the mob that attacked both victims, Hamilton is "criminally culpable" even though he may not have "actively encouraged, aided, or countenanced" the assaults. Harrell, 11 Va. App. at 8, 396 S.E.2d at 683.

In summary, we find sufficient evidence to sustain Hamilton's convictions for the mob assaults of Small, Payne, and Johnston.

B. Participation in a Criminal Street Gang

Finally, Hamilton contends that the Commonwealth failed to prove beyond a reasonable doubt that he participated in a criminal street gang in violation of Code § 18.2-46.2. Hamilton maintains there was no evidence that he was an active participant or member of the Bloods, as required under the statute.

Code section 18.2-46.2(A) states in part:

> Any person who actively participates in or is a member of a criminal street gang and who knowingly and willfully participates in any predicate criminal act committed for the benefit of, at the direction of, or in association with any criminal street gang shall be guilty of a Class 5 felony.

The offense of participating in a criminal street gang contains three elements that the Commonwealth must prove to sustain a conviction under the statute. First, a person must actively participate in or be a member of a criminal street

gang.  Second, the person must knowingly and willfully participate in a predicate criminal act.  Third, the act must be committed for the benefit of, at the direction of, or in association with the gang.  The term "[p]redicate criminal act" is defined as, among other things, "any violation of § 18.2-42", assault or battery by a mob.  Code §§ 18.2-46.1.

Hamilton contests only the sufficiency of the evidence with respect to the first element: being a member or active participant in a criminal street gang.[5]  According to Hamilton, proof of membership or participation in a gang must be distinct from proof of the commission of a predicate criminal act for the benefit of the gang.  Otherwise, according to Hamilton, one of the elements would be superfluous.  Hamilton thus argues there must be some evidence that he participated

---

[5] Hamilton does not dispute that the gang known as the Nine Trey Bloods is a "criminal street gang" under § 18.2-46.1.  The term "[c]riminal street gang" is defined as:

> any ongoing organization, association, or group of three or more persons, whether formal or informal, (i) which has as one of its primary objectives or activities the commission of one or more criminal activities; (ii) which has an identifiable name or identifying sign or symbol; and (iii) whose members individually or collectively have engaged in the commission of, attempt to commit, conspiracy to commit, or solicitation of two or more predicate criminal acts, at least one of which is an act of violence, provided such acts were not part of a common act or transaction.

Code § 18.2-46.1.

in the Bloods other than evidence that he committed one of the assaults. Such evidence is not present in this case, Hamilton argues, because the Commonwealth's gang expert, Hartless, testified that Hamilton was not involved with the Bloods before the party. Hamilton suggests that the only evidence supporting his conviction under this statute is his statement to McLaughlin that McLaughlin was "a Blood and [didn't] even know it." That statement, Hamilton asserts, is insufficient to establish his membership or active participation in the Bloods.

We conclude there was sufficient evidence, independent of the evidence showing Hamilton's criminal culpability for the attacks on Small, Payne, and Johnston, to establish that Hamilton actively participated in the Bloods at the party. The General Assembly, by writing the statute in the disjunctive, clearly contemplated either membership or participation as sufficient for a conviction under the statute. Hamilton admitted that he came to the party wearing a black and red hat. However, McLaughlin testified that Hamilton was dressed in a red hat and a red shirt. Further, Hamilton approached McLaughlin, also dressed in red, and told him: "You're a Blood and you don't even know it." In addition, Hamilton arrived at the party and was frequently seen with Hart, who witnesses established as one of the

individuals wearing red and protecting Scott.  Based on these facts, the jury's determination that Hamilton was an active participant in the Bloods was not plainly wrong or without evidence to support it.  See Code § 8.01-680.

Furthermore, Hamilton's participation in the Small assault, which he concedes occurred first, constituted active participation in the Bloods, while his role in the mob that attacked Payne and Johnston served as the predicate criminal acts committed for the benefit of the Bloods.  Thus, even under Hamilton's theory, there was distinct evidence establishing both Hamilton's active participation in the Bloods and his commission of a predicate criminal act for the benefit of the Bloods.

### III.  CONCLUSION

For these reasons, we hold that the evidence was sufficient to sustain Hamilton's three convictions for assault and battery by a mob in violation of Code § 18.2-42 and his conviction for participating in a criminal street gang in violation of Code § 18.2-46.2.  Thus, we will affirm the judgment of the Court of Appeals.

Affirmed.

23