COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judge Alston and Senior Judge Annunziata
Argued at Salem, Virginia


MATTHEW ANTONIO SALCEDO
                                                            OPINION BY
v.       Record No. 1325-10-3          CHIEF JUDGE WALTER S. FELTON, JR.
                                                            JULY 19, 2011
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
Michael S. Irvine, Judge

Ross S. Haine, Assistant Public Defender (Office of the Public
Defender, on brief), for appellant.

Karen Misbach, Assistant Attorney General (Kenneth T. Cuccinelli,
II, Attorney General, on brief), for appellee.


Following a bench trial, Matthew Salcedo ("appellant") was convicted by the Circuit

Court of Rockbridge County ("trial court"), as a principal in the second degree, of robbery, in

violation of Code § 18.2-58, use of a firearm in the commission of robbery, in violation of Code

§ 18.2-53.1, and participation in a criminal act for the benefit of a criminal street gang, in

violation of Code § 18.2-46.2.  On appeal, appellant contends the evidence was insufficient to

sustain each of his convictions.  For the following reasons, we affirm appellant's convictions.

## I.  BACKGROUND

"On appeal, we consider the evidence in the light most favorable to the Commonwealth,

the prevailing party in the [trial] court, and we accord the Commonwealth the benefit of all

reasonable inferences deducible from the evidence."  Brown v. Commonwealth, 278 Va. 523,

527, 685 S.E.2d 43, 45 (2009).  The evidence presented at trial proved the following.  On August

16, 2009, appellant met Juan Lebron,[1] Damon Turner,[2] Leon Hunt, and appellant's girlfriend, Stephanie Jarmillo.[3] During the day, Jarmillo drove the group around in appellant's mother's van. They went to a convenience store in Rockbridge County several times during that day. While they drove around in the van, the group discussed their need for money to buy marijuana. Hunt was the only individual in the van with any money. Hunt saw two handguns laying "[b]arrel to butt" in the front of the van, in between the driver's and front passenger's seats.[4] Prior to his leaving the group in the van around 9:30 p.m.,[5] Hunt heard appellant tell Turner to "man up."

On that same day, just prior to closing time at the convenience store, Sadie Claytor, a relative of the store's owner, was sitting on a bench outside the store. A man wearing clothing to conceal his face ran up to her, put a gun to her face, and said, "this is a stick up." He then ran inside the store. Claytor immediately ran to a man in a nearby vehicle and asked him to call 911. As Claytor proceeded back toward the store, she saw the same masked man leave the store and run through a field toward two individuals. She saw the masked man and the men in the field speak to each other, but was unable to hear what they were saying.

---

[1] Appellant and Lebron were convicted of identical crimes following a joint bench trial. Lebron also appealed his convictions to this Court. See Lebron v. Commonwealth, __ Va. App. __, __ S.E.2d __ (2011) (this day decided).

[2] Approximately two months after appellant and Lebron were convicted, Turner, a juvenile, entered guilty pleas to robbery, use of a firearm in the commission of robbery, participation in a criminal act for the benefit of a criminal street gang, and assault and battery.

[3] Appellant, Lebron, and Jarmillo lived together at appellant's mother's house.

[4] Virginia State Police Special Agent Eric Vega, qualified as an expert in criminal street gangs, testified that displaying firearms "[b]arrel to butt" forms a diamond pattern that "is representative of [the Latin Kings gang]."

[5] At some point during the evening, Jarmillo also went home after which Lebron drove the van.

Eva Moore, an employee of the convenience store, testified that at approximately 11:00 p.m. that day, an armed man, with clothing concealing his face, entered the store, put a gun to her head, and demanded money. That man then took the cash drawer and a change bag, and quickly left the store.[6]

Rockbridge County Sheriff's Deputy Steve Funkhouser responded to the 911 call at the convenience store and found a trail of cash, receipts, checks made out to the convenience store, the store's bank bag, black gloves, and a BB gun. He found those items along the path where Claytor saw the masked man run from the store toward a nearby field. Funkhouser also found a blue shirt, a red shirt, and additional receipts from the convenience store scattered along Route 130.[7] Turner's DNA was found on the black gloves.

The surveillance videotape from the convenience store showed the following:

- At 5:40 p.m., a van belonging to appellant's mother entered the parking lot of the store. Appellant, Lebron, and Turner entered the store. The three men left the store.

- At 6:48 p.m., Lebron and Turner re-entered the store.

- At 9:20 p.m., appellant, Lebron, and Turner re-entered the store.

- At 10:42 p.m., appellant's mother's van was parked at the rear of the store.

- At 10:49 p.m., appellant again entered the store.

- At 11:03 p.m., a person with clothing concealing his face, meeting Turner's height and physical characteristics, armed with a firearm, entered the convenience store, placed a gun to the head of the cashier, and took the cash register drawer.

Appellant's mother's van was not in the store's parking lot at the time the robbery occurred.

---

[6] A video surveillance camera recorded the robbery.

[7] Route 130 is a roadway running through the town of Glasgow, where the convenience store was located, and Natural Bridge, where appellant resided with his mother.

On August 17, 2009, the day following the robbery, Hunt, who had been in the van the day before, called the sheriff's department after hearing about the robbery at the convenience store. He told the officers that he had been with "Chino"[8] and "Blaze"[9] the day before and that they had BB guns, no money, and were riding around looking for marijuana.

During his investigation of the convenience store robbery, Investigator Funkhouser discovered an unrelated outstanding misdemeanor warrant for appellant charging possession of marijuana. He proceeded to appellant's mother's residence and there arrested appellant on the outstanding warrant.[10] Officers arrested Turner and Lebron later that day.

Lieutenant Timothy Hickman, a Rockbridge County Sheriff's Deputy, searched appellant's mother's residence, pursuant to a search warrant. Hickman seized multiple gang-related items, as well as seven computers belonging to appellant. Hickman described the colors, items, and tattoos associated with the Latin Kings. He testified appellant had tattoos associated with the Latin Kings. Numerous photographs were found on appellant's computer depicting appellant, Lebron, and others wearing gang colors, black and yellow "three-sixty" beads, and making Latin Kings hand gestures. Over five thousand items containing some indicia

---

[8] Lebron's street name is "Chino."

[9] Appellant's street name is "Blaze."

[10] Following his arrest on August 17, 2009, appellant gave three written statements to Investigator Funkhouser. In his first two statements, appellant denied all involvement with the robbery. In these statements, appellant asserted he found out about the robbery after it occurred from an acquaintance and from an elderly couple at a nearby convenience store and that he had a "hunch" Turner committed the robbery. In his third written statement, however, appellant acknowledged that he and Lebron accompanied Turner to his house prior to the robbery, that Turner obtained clothing from his house, that Turner stated he wanted money, that he, Lebron, and Turner returned to the convenience store where Lebron parked appellant's mother's van near a "firehouse place," and that Turner entered the store, returned to the van with money, and told appellant and Lebron to drive away. Appellant told Investigator Funkhouser he did not know Turner planned to rob the convenience store and that he "was a passenger in the wrong place at the wrong time."

of gang affiliation were found on the seized computers, including documents listing "King Ceazan" as the "Inca" of the "Pennsylvania State Golden Crown Lion Tribe Almighty Latin King [and] Queen Nation."

At trial, Virginia State Police Special Agent Eric Vega, qualified as an expert in criminal street gangs, testified as to the history of the Almighty Latin King and Queen Nation ("Latin Kings") and the structure of the gang. He told the trial court that the Latin Kings are known to engage in criminal activity, including money laundering and narcotics trafficking. The colors for the gang were black and gold or yellow, and the members wore black and yellow "three-sixty" beads as part of their uniform. Vega identified color photographs, obtained during the search of appellant's mother's home, showing appellant wearing the black and yellow gang beads, wearing the colors for the gang, and giving a Latin Kings salute. Vega identified a photo of a tattoo on appellant's arm, depicting the name "King Ceazan." Vega told the trial court that "[e]very [Latin King] has a [K]ing name and [this tattoo] is telling me that [appellant's] name is King Ceazan." Vega identified another of appellant's tattoos, depicting an individual wearing a five-pointed crown where the points on the crown were diamonds. Vega stated that the diamonds signified a person of "high" rank in the Latin Kings. Vega noted that the convenience store's surveillance tape showed appellant wearing gang beads when he was inside the convenience store during one of the group's earlier visits prior to the robbery.

Special Agent Vega testified that "tribes" in each state represent the national Latin Kings organization and that each state or tribe has an assigned "Inca." The "Inca" is the "top of the line, the boss," and "[the Inca's] orders are not to be questioned." The Inca "ensure[s] that the rules, regulations, [and] policies that they have within the structure are adhered to" and that punishment for failure to adhere to gang rules can result in "anything from monetary fines to physical discipline[,] up to and including death." Special Agent Vega testified that within the

Latin Kings, the phrase "man up" challenges a person's bravado, and "means . . . that person has to come through with what they said they were going to do." When used by a high-ranking gang member, the phrase is "basically an order, you know, what you have to do, you've got to do it."

Turner testified as a defense witness for both appellant and Lebron during the joint trial. He admitted he robbed the convenience store while armed with a BB gun. He told the trial court that appellant and Lebron were not involved in the robbery and that appellant did not tell him to "man up." He also testified that he was not a member of the Latin Kings and he could not remember whether he had ever seen appellant and Lebron wearing black and yellow beads. Turner, who was a juvenile at the time of the robbery, had known appellant for six or seven years. Appellant's mother and Turner's father had been friends before Turner's birth.

Dimitri Dunn, appellant's friend of four years, testified that Turner wore black and yellow beads and used Latin Kings hand signs. Deputy Sheriff C.J. Blaylock identified a photograph taken at the time of Turner's arrest, depicting a tattoo of a crown on Turner's body. Special Agent Vega testified that Turner had gang symbols on the jeans he wore to court for trial.

Testifying in his defense at the joint trial, appellant admitted that he was a member of the Latin Kings, that his title was King Ceazan, and that he was at one time the "Inca" for the Golden Crown Lion Tribe of Pennsylvania.[11] He also stated that Lebron was on the Latin Kings council. Appellant admitted to the trial court that his first two statements to Investigator Funkhouser were not accurate. In his third statement, appellant stated he, Lebron, and Turner stopped at Turner's house and there Turner retrieved items of clothing that he later wore during the robbery. Appellant denied telling Turner to "man up" the day of the robbery and denied that Turner was a member of the Latin Kings. Appellant testified he did not know Turner planned to

---

[11] Appellant testified he was no longer the Inca in Pennsylvania because he resided in Virginia.

rob the convenience store and did not realize Turner had done so until he reentered appellant's mother's van after committing the robbery.

At the conclusion of the trial, the trial court found the evidence established that appellant was an active participant in the robbery, that the Latin Kings was a criminal street gang, and that the robbery was committed "in association with" the Latin Kings. It found that appellant's testimony was inconsistent with the statements he gave to Investigator Funkhouser and that appellant failed to explain his presence in the store ten to fifteen minutes before Turner committed the robbery. The trial court further found that appellant entered the store ten to fifteen minutes before Turner committed the robbery to "cas[e]" the store. It noted that appellant and Lebron wore gang colors on the day of the robbery. The trial court also found that Hunt's testimony that the firearms were clearly visible in appellant's mother's van was credible, that appellant, Turner, and Lebron went to Turner's house so Turner could obtain additional clothing, and that appellant heard Turner state prior to the robbery that he wanted money.

## II. ANALYSIS

### Sufficiency

Appellant contends the evidence was not sufficient to convict him as a principal in the second degree of robbery, use of a firearm in the commission of robbery, and participating in a criminal act for the benefit of a criminal street gang.

"When a defendant challenges on appeal the sufficiency of the evidence to sustain his conviction, this Court 'has a duty to examine all the evidence that tends to support the conviction.'" Hamilton v. Commonwealth, 279 Va. 94, 103, 688 S.E.2d 168, 173 (2010) (quoting Bolden v. Commonwealth, 275 Va. 144, 147, 654 S.E.2d 584, 586 (2008)). After viewing the evidence in the light most favorable to the Commonwealth, the question is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a

- 7 -

reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); accord Corado v. Commonwealth, 47 Va. App. 315, 337, 623 S.E.2d 452, 463 (2005). "If there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." Commonwealth v. Taylor, 256 Va. 514, 518, 506 S.E.2d 312, 314 (1998). "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995).

"'Circumstantial evidence [presented during the course of the trial] is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" Holloway v. Commonwealth, 57 Va. App. 658, 665, 705 S.E.2d 510, 513 (2011) (quoting Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983)). "The statement that circumstantial evidence must exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." Commonwealth v. Hudson, 265 Va. 505, 513, 578 S.E.2d 781, 785 (2003).

A. Robbery and Use of a Firearm in the Commission of Robbery

Appellant contends the trial court erred in finding him guilty as a principal in the second degree of robbery and use of a firearm in the commission of robbery. He asserts there was no direct evidence that he participated in the robbery or knew that Turner was going to rob the convenience store.

"It is a well-settled rule that a defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime." McMorris v.

Commonwealth, 276 Va. 500, 505, 666 S.E.2d 348, 351 (2008).[12] In order to convict an accused as a principal in the second degree, the Commonwealth must prove "that the defendant procured, encouraged, countenanced, or approved the criminal act." Id. at 505, 666 S.E.2d at 350.

Here, the evidence presented at trial proved that throughout the day of August 16, 2009, appellant, Lebron, and Turner repeatedly entered the convenience store. Each wore gang colors and the black and yellow "three-sixty" beads associated with the Latin Kings. Hunt, who was present for most of the day, saw two guns laying "[b]arrel to butt" in the van in which the men were riding, and heard appellant, Lebron, and Turner discuss that they needed money to buy marijuana. At some point during the evening prior to his departure from the group, Hunt heard appellant tell Turner that he needed to "man up." Appellant permitted Lebron to drive appellant's mother's van to Turner's home so Turner could obtain additional clothing. Lebron was the driver of the van when the men returned to the area of the convenience store at approximately 11:00 p.m. Lebron parked the van where he was told to park it, out of sight from the convenience store. Appellant entered and surveyed the store prior to Turner's committing the robbery. Appellant was present when Turner came running back with a shirt on his head, carrying the cash register drawer he took from the convenience store. Appellant was present in the van when Lebron drove it away from the crime scene. He saw Turner throw the shirt covering his head out of the van window, and was present when Lebron stopped the van at a dumpster where Turner threw out the cash register drawer.

From the record presented on appeal, we conclude that the trial court did not err in finding the evidence sufficient to prove appellant was guilty of robbery and use of a firearm in the commission of robbery as a principal in the second degree. See Kelly v. Commonwealth, 41

---

[12] "In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree." Code § 18.2-18.

Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*) (holding appropriate sufficiency of

evidence question is whether "any rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt" (quoting Jackson, 443 U.S. at 319)).

B.  Criminal Street Gang

Appellant contends the Latin Kings gang is not a criminal street gang as defined by Code

§ 18.2-46.1.  He also contends that, even if the evidence was sufficient to show that the Latin

Kings was a criminal street gang, the evidence was insufficient to show that the robbery was

committed for the benefit of, in association with, or at the direction of the gang in violation of

Code § 18.2-46.2.

"Criminal street gang" is defined by Code § 18.2-46.1 as:

> any ongoing organization, association, or group of three or more
> persons, whether formal or informal, (i) which has as one of its
> primary objectives or activities the commission of one or more
> criminal activities; (ii) which has an identifiable name or identifying
> sign or symbol; and (iii) whose members individually or collectively
> have engaged in the commission of, attempt to commit, conspiracy to
> commit, or solicitation of two or more predicate criminal acts, at
> least one of which is an act of violence, provided such acts were not
> part of a common act or transaction.

Code § 18.2-46.2(A) states in pertinent part:

> Any person who actively participates in or is a member of a criminal
> street gang and who knowingly and willfully participates in any
> predicate criminal act committed for the benefit of, at the direction
> of, or in association with any criminal street gang shall be guilty of a
> Class 5 felony.

The term "predicate criminal act" is defined as, among other things, an "act of violence" as

described in Code § 19.2-297.1(A), including first and second degree murder, robbery, and

manufacturing, selling, giving, distributing, or possessing with intent to manufacture, sell, give, or

distribute a controlled substance as defined by Code § 18.2-248.

- 10 -

### 1.  Code § 18.2-46.1

We conclude from the record on appeal that the trial court did not err in finding beyond a reasonable doubt that the Latin Kings was, at the time of the robbery, a criminal street gang as defined by Code § 18.2-46.1.  Special Agent Vega, qualified as an expert in criminal street gangs, testified that Latin Kings gang members engage in criminal enterprises, including money laundering and narcotics trafficking, that the Latin Kings have adopted black and gold as the gang's identifying colors, that they wear the symbol of the "sacred crown" and colored beads as part of their clothing attire, and that they use particular identifiable hand signs to identify themselves as gang members.  Special Agent Vega also testified that, as required by Code § 18.2-46.1, members of the Latin Kings had engaged in at least two "predicate criminal acts" that were not part of a common transaction, at least one of which was violent.[13]  Accordingly, we conclude that the trial court did not err in finding the evidence presented was sufficient beyond a reasonable doubt to prove that the Latin Kings was a criminal street gang as defined by Code § 18.2-46.1.

### 2.  Code § 18.2-46.2

We further conclude from the record on appeal that the trial court did not err in finding beyond a reasonable doubt that the robbery was committed in association with and at the direction of the Latin Kings in violation of Code § 18.2-46.2.  In order to obtain a conviction under Code § 18.2-46.2(A), the Commonwealth must prove three elements.  First, the Commonwealth must prove that an accused "actively participate[s] in or [is] a member of a criminal street gang.  Second, the [accused] must knowingly and willfully participate in the predicate criminal act.  Third, the

---

[13] Special Agent Vega testified that Luis Felipe, a founding member of the Latin Kings on the East Coast, and Antonio Fernandez, the Supreme Inca for the Latin Kings of New York, had been convicted and were serving federal sentences for murder and narcotics trafficking, respectively.

[predicate criminal] act must be committed for the benefit of, at the direction of, or in association with the gang." Hamilton, 279 Va. at 108, 688 S.E.2d at 177.

The record on appeal demonstrates that appellant, a high-ranking gang member, told Turner to "man up," a command used by the Latin Kings. In the Latin Kings gang language, the term "man up" is a command from a higher-ranking gang member to a lower-ranking gang member to engage in conduct as directed. Throughout the day of the robbery, appellant was seen on the surveillance video from the convenience store wearing the black and yellow "three-sixty" beads associated with the Latin Kings. Additionally, the surveillance video showed Turner wearing the colors of the Latin Kings when he committed the robbery. The Commonwealth's gang expert witness testified that members of the Latin Kings only show their beads when they want others to know they are part of that street gang. We cannot say, based on the record before us on appeal, that "no rational factfinder," Haskins v. Commonwealth, 44 Va. App. 1, 9, 602 S.E.2d 402, 406 (2004), would have come to the conclusion that the robbery was committed "for the benefit of, in association with, or at the direction of" a criminal street gang in violation of Code § 18.2-46.2. Accordingly, we conclude that the trial court did not err in finding the evidence sufficient to convict appellant of robbery "for the benefit of, in association with, or at the direction of" a criminal street gang in violation of Code § 18.2-46.2.

### III. CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

Affirmed.