COURT OF APPEALS OF VIRGINIA

Present:   Judges Friedman, Callins and White
Argued at Salem, Virginia


MOHAMMED SABRI LAYLANI

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0128-22-3            JUDGE KIMBERLEY SLAYTON WHITE
                                                         MAY 16, 2023
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
Thomas J. Wilson, IV, Judge

Jessica N. Sherman-Stoltz (Sherman-Stoltz Law Group, PLLC, on
briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General; Robin M. Nagel, Assistant Attorney
General, on brief), for appellee.


Following a jury trial, the trial court convicted Mohammed Sabri Laylani (Laylani) for rape

and sodomy and sentenced him to life imprisonment for each offense.  Laylani challenges the

sufficiency of the evidence to support his convictions.  Laylani also contends that the trial court

erred by "not allowing enough time" to find an appropriate interpreter for his proposed witness.

Finding no trial court error, we affirm the judgment.

                                        BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the

prevailing party in the trial court."  *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  In doing so, we discard any of

Laylani's conflicting evidence, and regard as true all credible evidence favorable to the

---

* This opinion is not designated for publication.  *See* Code § 17.1-413.

Commonwealth and all inferences that may reasonably be drawn from that evidence. *Cady*, 300 Va. at 329.

D.M.[2] met Laylani in 2017 through his automotive repair business. They developed a romantic relationship after about six months of spending time together. Laylani moved into D.M.'s Harrisonburg home with her and her two teenaged daughters in December 2018. They then committed themselves as husband and wife in a religious ceremony, although they were not legally married.

In June 2019, D.M. suspected Laylani was having an affair with another woman after finding some photographs and messages on his cell phone. D.M. and Laylani, who denied the suspicions, separated as a result of their argument about the infidelity. D.M. and Laylani later reconciled, and for the next few months he spent the night at her home once or twice per week, and they resumed sexual relations. D.M. admitted that she continued to look through Laylani's phone and used it to call two females she suspected of involvement with him to warn them that he was "her man."

On the afternoon of September 19, 2019, D.M.'s sister in Iraq called to report that their mother was sick and in the hospital. Upset by the report, D.M. went to Laylani's car repair shop for consolation. She found Laylani talking to customers, so she went to the office to wait for him there. When she unlocked and opened the office door, D.M. found a woman who was disrobed and who was "trying to pull [on] her underwear." The woman was on the couch with a pillow and blanket. D.M. questioned her about her presence there, but the woman did not respond and "just kept dressing." When Laylani appeared, he said that the woman was a customer who was tired, so he let her sleep in the office while her car was fixed. Laylani introduced the woman as

---

[2] Given the nature of the offenses at issue, we will refer to the victim by her initials to protect her privacy.

"Shannon." D.M. was angry about the situation. Before she left the shop, D.M. "got [her] period" and bled on her pants, so Laylani gave her a towel to clean up.

At home that evening, D.M. did not confront Laylani about the situation in front of her daughters because she did not want to upset them. After the girls were in bed, D.M. asked if Laylani wanted to talk about what happened earlier that day. Laylani became very angry and accused D.M. of being jealous for no reason. While pointing her finger at Laylani, D.M. insisted that she had seen the woman in the office. Laylani grabbed and squeezed her finger, bringing D.M. to the floor in pain. Laylani slapped D.M.'s face with an open hand and punched her head with his fist.[3] Laylani blamed D.M. for the violence because she had made him angry. D.M. was "terrified" and "scared," but did not want to awaken her daughters. D.M. remained on the bed in silence and eventually fell asleep.

D.M. awakened to Laylani kissing and "holding" her. When she asked what he was doing, he said, "I love you, you are mine, and you will do anything I want." D.M. said no, that she did not "feel like [she] want[ed] to do anything," and to leave her alone. Laylani "pulled [her] up" to his penis, pushed her head and neck "down there," and made her perform oral sex. He said that she belonged to him, and he would kill her if he saw her with another man. D.M., who was crying, told Laylani to stop. Laylani got on top of D.M. and penetrated her vagina with his penis. D.M. was frozen with fear while Laylani had sex with her against her will. She described him as a "monster" and that he "was totally a different person." Laylani "finish[ed] on her chest." D.M. wiped her chest, put her clothes on, and waited for Laylani to go to sleep.

Within a few hours of the attack, D.M. took her phone to the bathroom and called the police. Police and paramedics arrived at the home and took D.M. to the hospital. D.M., who

---

[3] The Commonwealth introduced a photograph that was taken hours later of the injury she sustained from the blows.

appeared very frightened, reported that Laylani had slapped and punched her, ordered her to perform oral sex on him, and then had sexual intercourse with her. D.M. advised medical personnel that there was a tampon in her vagina because she was having her period. During a physical examination, Jason Wilson, a physician's assistant at the hospital, removed a tampon from D.M's vagina; Wilson noted that the tampon was "crushed deep in the vagina." There was no active bleeding from D.M.'s cervix, and Wilson noted no vaginal or cervical lacerations. Wilson observed bruising and swelling to D.M.'s face. She also had tenderness in her hand.

When the police questioned D.M. at the hospital, she was very confused, upset, and in physical pain; D.M. did not tell the police detective about the bleeding incident at the car repair shop earlier that day. She mentioned that she and Laylani had had a fight about a woman.

At trial, Laylani called Najat Salihi, a Kurdish speaker, to the witness stand to testify in his defense. Although Laylani had not notified the court before trial of the need for an interpreter for Salihi, the court was able to secure the services of a Kurdish interpreter who would provide translation over the telephone. However, the interpreter who had been engaged indicated that his Kurdish dialect was Kurmanji and Salihi's dialect was Sorani. As a result, the interpreter was unable to translate for Salihi. The interpreter offered to transfer the trial court to "customer service" to see if a Sorani interpreter was available. The trial court declined and released the jury for the day.

When the trial resumed the following morning, the trial court indicated that it was unsuccessful in its attempt to find an appropriate interpreter. The trial court advised defense counsel to "call [his] next witness." Laylani rested his case without raising any objection to the procedure or proffering the substance of Salihi's anticipated testimony. Laylani neither requested a recess nor continuance. After the jury left the courtroom, the trial court stated:

> I'm going to go ahead and put on the record that since yesterday
> evening we have made a lot of efforts to try and obtain a Sorani

- 4 -

> dialect Kurdish interpreter, including this morning on several attempts by telephone, and also attempting to find [sic] to appear in person. The Clerk's office and the Court have had no prior warning that one was going to be necessary, but we've made our best efforts to find one for you and you understand, [defense counsel]?

Defense counsel responded, "Yes, sir." The jury convicted Laylani of both rape and sodomy, and fixed his punishment at life imprisonment for each offense.

In a motion to set aside the verdict, Laylani argued that the evidence was insufficient to sustain his convictions because D.M.'s testimony was incredible, the evidence did not prove that he and D.M. had sexual intercourse on the night of the offenses, and that the evidence did not prove that the offenses were accomplished by "force, threat, or intimidation." Laylani also claimed that the trial court "erred by not allowing enough time to find an interpreter appropriate for" Salihi. Laylani still did not provide the substance of Salihi's testimony. Laylani alleged only that Salihi was an "essential witness" who could have provided "first-hand knowledge and testimony that contradicted" D.M.'s "testimony as it related to her second visit to the [d]efendant's shop on the alleged date of [the] offense."

The trial court denied Laylani's motion to set aside due to insufficient evidence, finding that, upon the evidence, "the jury could easily have found[] that the elements were proven beyond a reasonable doubt on both counts." The trial court also refused to set aside the verdict based upon the claim involving the interpreter, noting that there was no objection to proceeding with the trial without the interpreter and no proffer of the witness's testimony. The trial court sentenced Laylani in accordance with the jury's verdict. This appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

Laylani contends that the evidence was insufficient to sustain his convictions because D.M.'s testimony was inherently incredible, the Commonwealth did not prove that he and D.M.

had sex on the night of the attack, and the Commonwealth did not prove that any sexual act was accomplished through "force, threat or intimidation."

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

All three of Laylani's challenges to the sufficiency of the evidence relate to the credibility of D.M. and the other witnesses and the appropriate weight of their testimony. However, "[t]he fact finder, who has the opportunity to see and hear the witnesses, has the sole responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Rams v. Commonwealth*, 70 Va. App. 12, 26-27 (2019) (quoting *Hamilton v. Commonwealth*, 279 Va. 94, 105 (2010)). This Court gives "deference to the fact finder who, having seen and heard the witnesses, assesses their credibility and weighs their testimony." *Elliott v. Commonwealth*, 277 Va. 457, 462 (2009).

In light of the jury's apparent credibility determination in finding Laylani guilty, this Court "may only . . . disturb[]" its conclusion "on appeal if this Court finds that [the witness'] testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'" *Johnson v. Commonwealth*, 58 Va. App. 303, 315 (2011) (second

alteration in original) (quoting *Robertson v. Commonwealth*, 12 Va. App. 854, 858 (1991)). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006) (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)). Thus, "there can be no relief" in this Court if a witness testifies to facts "which, if true, are sufficient" to support the conviction "[i]f the trier of . . . facts" bases its decision "upon that testimony." *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010) (quoting *Swanson v. Commonwealth*, 8 Va. App. 376, 379 (1989)).

Virginia law is clear that the jury was entitled to convict Laylani based solely upon D.M.'s testimony because it found her credible and believed her testimony. *See Fisher v. Commonwealth*, 228 Va. 296, 299 (1984); *Wilson v. Commonwealth*, 46 Va. App. 73, 87 (2005). There is no requirement of a corroborating eyewitness because, as the Virginia Supreme Court has aptly stated, a "requirement of corroboration would cause most sex offenses to go unpunished[,]" given the clandestine nature of such crimes. *Fisher*, 228 Va. at 299. In addition, to prove Laylani's guilt of rape and sodomy, the Commonwealth was not required to "demonstrate that the complaining witness cried out or physically resisted" Laylani during the attack. Code § 18.2-67.6; *see also Farish v. Commonwealth*, 2 Va. App. 627, 632 (1986).

The inconsistencies in D.M.'s testimony that Laylani raises to this Court simply do not render her testimony "so manifestly false that reasonable men ought not to believe it[.]" *See Juniper*, 271 Va. at 415. D.M. admitted that she had been suspicious that Laylani was unfaithful to her in the past and that they had argued about her jealousy. She visited Laylani's car repair shop on the day of the attack because she had received disturbing news about her mother's health. She found a partially clothed woman in Laylani's locked office and confronted him about it. D.M. was angry, and she argued with him about the situation.

When D.M. tried to discuss the incident with Laylani later that night, he grabbed her finger and squeezed it, causing her pain. He also slapped D.M. and punched her in the head. Laylani blamed D.M. for his use of force against her, and she was terrified.

D.M. awakened later to find Laylani kissing and holding her. When she questioned what he was doing, he said that she belonged to him and would do anything he wanted. Upon her refusal and communicated desire to be left alone, Laylani forced her to perform oral sex on him. Afterward, Laylani got on top of D.M. and forced his penis into her vagina. D.M. was frozen with fright. She testified that when Laylani attacked her he was like a "monster," and not the person she knew and loved.

D.M. waited for Laylani to fall asleep so that she could escape and call 911. She appeared frightened and intimidated when help arrived to take her to the hospital. She reported that Laylani had slapped and punched her, raped her, and put his penis in her mouth. A photograph of D.M. taken at the hospital showed bruising to her face. During a physical examination, Wilson recovered a "crushed" tampon deep inside D.M.'s vagina, supporting her claim that Laylani had forced intercourse with her.

Considering D.M.'s testimony and the other facts and circumstances, the evidence was sufficient to prove that Laylani, through both force and intimidation, penetrated her vagina with his penis and made her perform oral sex upon him against her will. *See* Code §§ 18.2-61 and 18.2-67.1. Accordingly, a reasonable finder of fact could conclude beyond a reasonable doubt that Laylani was guilty of rape and sodomy.

## II. Unavailability of Interpreter

As he argued in his motion to set aside the verdict, Laylani claims that the trial court erred by "not allowing enough time to find" an appropriate interpreter to permit Salihi to testify. Laylani did not raise this issue when the trial court announced it would proceed with the trial

despite being unable to find an interpreter after the problem with the first interpreter arose. Neither did Laylani proffer the content of the testimony Salihi would have given had an interpreter been located.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of th[e] contemporaneous objection requirement [in Rule 5A:18] is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Not just any objection will do. It must be both specific and timely — so that the trial judge would know the particular point being made in time to do something about it." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009).

Laylani failed to raise the issue he advances on appeal at a time when the trial court could have taken corrective action upon it. Indeed, defense counsel specifically acquiesced in the trial court's decision to proceed with the trial without the interpreter. "The [Virginia] Supreme Court has held that '[a] party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory.'" *Nelson v. Commonwealth*, 71 Va. App. 397, 403 (2020) (second alteration in original) (quoting *Rowe v. Commonwealth*, 277 Va. 495, 502 (2009)).

Laylani does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and the Court will not apply the exceptions *sua sponte*. *Edwards v. Commonwealth,* 41 Va. App.

752, 761 (*en banc*).  Accordingly, Rule 5A:18 bars our consideration of this assignment of error on appeal.

## CONCLUSION

For the foregoing reasons, we find that the evidence was sufficient to sustain Laylani's convictions.  We do not consider Laylani's claim concerning the interpreter because he did not properly preserve this issue for appellate review.  Thus, we affirm the trial court's judgment.

*Affirmed*.