COURT OF APPEALS OF VIRGINIA

Present: Judges Chaney, Callins and White
Argued by videoconference

DOROTEO DIAZ MARTINEZ

MEMORANDUM OPINION[*] BY
v.        Record No. 0591-22-4        JUDGE DOMINIQUE A. CALLINS
MARCH 26, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
John M. Tran, Judge

George L. Freeman, IV (The Law Offices of George L. Freeman, IV,
PLLC, on brief), for appellant.

Katherine Quinlan Adelfio, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a jury trial, Doroteo Diaz Martinez ("Diaz Martinez") was convicted of first-degree murder and criminal street gang participation. On appeal, Diaz Martinez argues that (1) the evidence was insufficient to convict him of first-degree murder as a principal in the second degree, (2) the evidence was insufficient to convict him of criminal street gang participation, and (3) the trial court erred in denying his proposed cautionary jury instruction regarding uncorroborated accomplice testimony. Finding no error, we affirm the trial court's judgment.

BACKGROUND

On appeal and in accordance with familiar principles of appellate review, we recite the facts "in the light most favorable to the Commonwealth, the prevailing party at trial." *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

(2016)). Therefore, we will "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

On April 22, 2019, Diaz Martinez, Armando Dagoberto Reyes Reyes ("Reyes Reyes"), Julieth Ford Ortega ("Julieth"), and Byron Estupinian ("Estupinian") abducted and murdered 16-year-old Richard Hernandez Cruz ("Richard") in the wooded area near Bryant Alternative High School in Fairfax County. Diaz Martinez, Reyes Reyes, and Estupinian were all associated with the criminal street gang MS-13, with Reyes Reyes being a high-ranking "homeboy" who could give orders to other members and Diaz Martinez being a lower-ranking member of the MS-13 "Chilanguera" clique. Reyes Reyes was known by the gang nickname "Sobietikho," and Diaz Martinez's gang nickname was "Nadie." Prior to the murder, Reyes Reyes and Julieth had been in an on-again-off-again relationship for around eight months, but they were not in a romantic relationship in April 2019. Julieth also dated Richard from December 2018 to April 2019, but they broke up before Richard's death.

At around 7:00 p.m. on April 22, 2019, Julieth went to Bryant Alternative High School to meet with Reyes Reyes in response to a text message from Reyes Reyes directing her to meet him there. Julieth sent a text message back to Reyes Reyes, telling him that she no longer wished to hang out with him, and Reyes Reyes responded that she had to travel to the school to be "jumped out" if she no longer wished to hang out. When Julieth arrived, Reyes Reyes, Estupinian, and a male named Enrique were present. Rather than trying to "jump out" Julieth, Reyes Reyes showed her text messages from a third party stating that Richard was "trying to kill her" with "brujeria," i.e., black magic. Reyes Reyes then told Julieth to call Richard and threatened to harm Julieth and her mother if she refused.

At around 11:00 p.m., Julieth called Richard and bought him an Uber ride to an apartment complex near the school using a prepaid Uber card that Julieth and Reyes Reyes had purchased at a nearby CVS. Meanwhile, Reyes Reyes told Estupinian to get baseball bats from the wooded area near the apartment complex. By then, Enrique had left the group and went home.

After Richard arrived at the apartment complex, Julieth and Richard walked towards the back of the apartment complex to the wooded area where Reyes Reyes and Estupinian were hiding. Reyes Reyes and Estupinian, who were carrying a bat and a machete, respectively, then grabbed Richard and forced him to keep walking into the woods. After about one minute of walking, Diaz Martinez suddenly appeared and struck Richard with a blow as he joined the group. The group kept walking deeper into the woods for about three minutes and then stopped. Reyes Reyes then asked Julieth to confront Richard about Richard's alleged use of black magic on her.

After Richard responded to Julieth's questions, the other group members immediately started punching and kicking Richard. Julieth testified that, because Reyes Reyes asked her to turn away and not to look, she only heard the sound of the beating without knowing who was doing what. Julieth also testified that it was dark and that she only knew that Diaz Martinez, Reyes Reyes, and Estupinian were surrounding Richard when the blows landed on Richard. The Commonwealth entered into evidence a drawing made by Julieth depicting Diaz Martinez's, Reyes Reyes's, and Estupianian's positions surrounding Richard during the beating. After the attacks finally stopped, Reyes Reyes said, "I think we went overboard." Richard was dead. Reyes Reyes also stated, "The Beast took him."

The following day, Diaz Martinez returned to the area where Richard was murdered to assist Julieth, Reyes Reyes, and others in burying Richard's body. Diaz Martinez did not need instructions on finding the location of Richard's body.

During a subsequent police interview, Diaz Martinez stated that, prior to the murder, Reyes Reyes had informed him about his plan to conduct a "birthday party" and that Julieth was going to lead a person into the woods for the "birthday party." Diaz Martinez explained that a "birthday party" is an MS-13 term for the gang's version of court. At a "birthday party" the gang imposes discipline, usually in the form of a beating, on a person who has committed a violation or an infraction. At trial, Detective Ray E. Betts was qualified as an expert witness on the MS-13 gang. Detective Betts explained that a "birthday party" entails "[a] violent attack, physical attack and . . . often times . . . they're planning to kill the individual." Diaz Martinez finally told the detectives that he went to Bryant Alternative High School on the night of the murder and met with Reyes Reyes, but that he left at around 11:00 p.m. before Richard arrived and that he was with his girlfriend Lincy Velasquez Flores ("Lincy") for the remainder of the night.

Lincy testified that, on the night of the murder, Reyes Reyes came to the apartment she shared with Diaz Martinez looking for Diaz Martinez. Lincy told Diaz Martinez, "Don't go," but Diaz Martinez left with Reyes Reyes. After the Commonwealth refreshed Lincy's recollection with records of her cell-phone calls, Lincy testified that, at around 1:00 a.m. on the morning after the murder, she called Julieth and Reyes Reyes multiple times to locate Diaz Martinez. Lincy testified that Diaz Martinez did not come home until after she called Julieth and Reyes Reyes at around 1:00 a.m.

At trial, crime analyst Jennifer Harrington testified as an expert in historical cell-site location and cell-tower analysis. Harrington testified that Lincy called Reyes Reyes at 1:07 and

1:09 a.m. and called Julieth at 1:08 and 1:10 a.m. on April 23, 2019. Harrington also testified that Reyes Reyes's and Julieth's cell-phone records showed that they were in the area of Bryant Alternative High School during the time of the murder.

Prior to the trial verdict, the trial court denied Diaz Martinez's proposed cautionary jury instruction regarding uncorroborated accomplice testimony, finding that Julieth's testimony was corroborated by other evidence. The proposed cautionary jury instruction provided:

> Julieth Ford Ortega has testified that she was an accomplice in the commission of the crimes charged in the indictment. While you may find your verdict upon h[er] uncorroborated testimony, you should consider such testimony with great care and you are cautioned as to the danger of convicting the defendant upon the uncorroborated testimony of an accomplice. Nevertheless, if you are satisfied from the evidence of the guilt of the defendant beyond a reasonable doubt, the defendant may be convicted upon the uncorroborated evidence of an accomplice.

The jury ultimately found Diaz Martinez guilty of first-degree murder and criminal street gang participation. The trial court imposed a sentence of 20 years for the first-degree murder charge and 2 years for the criminal street gang participation charge. This appeal followed.

ANALYSIS

I. Cautionary Jury Instruction

Diaz Martinez argues that the trial court erred in refusing his proposed cautionary jury instruction regarding uncorroborated accomplice testimony. Diaz Martinez asserts that Julieth was an accomplice to the murder and that no evidence corroborated her testimony that he was present when the murder occurred. Thus, Diaz Martinez maintains, the trial court should have permitted his proposed cautionary jury instruction because Julieth's testimony as an accomplice was uncorroborated.

"The trial court has 'broad discretion in giving or denying instructions requested,' and we review those decisions under an abuse of discretion standard." *Barney v. Commonwealth*, 69

- 5 -

Va. App. 604, 609 (2019) (quoting *Gaines v. Commonwealth*, 39 Va. App. 562, 568 (2003) (en banc)). Yet, it is well established that where the Commonwealth advances accomplice testimony in support of her case, the trial court has a "duty . . . to warn the jury against the danger of convicting upon such uncorroborated testimony." *Dillard v. Commonwealth*, 216 Va. 820, 821 (1976). If an accomplice's testimony is uncorroborated, it is error for a trial court to refuse the cautionary instruction. *Id.* Thus, "[t]he test . . . in determining whether a cautionary instruction should be granted becomes this: is corroborative evidence lacking?" *Id.* at 822. If no evidence exists to corroborate an accomplice's testimony, a trial court must grant a cautionary accomplice instruction; if evidence exists to corroborate an accomplice's testimony, a trial court properly refuses the same. *Id.*

As to the quantity and quality of corroborative evidence necessary to justify a trial court's refusal of a cautionary accomplice instruction, "[t]he corroborative evidence, standing alone, need not be sufficient either to support a conviction or to establish all the essential elements of an offense." *Id.* at 823. But, "[w]here . . . the testimony of an accomplice is corroborated in material facts which tend to connect the accused with the crime, sufficient to warrant the jury in crediting the truth of the accomplice's testimony, it is not error to refuse a cautionary instruction." *Id.* The sufficiency of the corroboration is a question of law that we review de novo. *Holmes v. Commonwealth*, 76 Va. App. 34, 56 (2022).

In considering whether the trial court abused its discretion, we view the evidence in the light most favorable to Diaz Martinez, the proponent of the jury instruction. *Holloman v. Commonwealth*, 65 Va. App. 147, 174 (2015). Even so, here we hold that the trial court did not err in refusing Diaz Martinez's proposed cautionary jury instruction, as other evidence corroborated Julieth's accomplice testimony that Diaz Martinez was present during Richard's murder. First, during his police interview, Diaz Martinez admitted he knew that a "birthday

- 6 -

party" was an MS-13 euphemism for gang discipline in the form of a beating, that Reyes Reyes told Diaz Martinez his plan to give a "birthday party," and that Julieth was going to lead a person into the woods for the "birthday party." Diaz Martinez also admitted to going to Bryant Alternative High School on the night of the murder to meet with Reyes Reyes. Second, Lincy's testimony confirmed that, after the meeting at Bryant Alternative High School, Reyes Reyes came "closer to nighttime" to the home she shared with Diaz Martinez and "told [them] to go to a party" and that Diaz Martinez left the home shortly after Reyes Reyes's visit. Lincy also testified that she called Julieth to ask where Diaz Martinez had been after he left the home because "I knew they were together . . . they were always together" and that "Julieth was always with [Reyes Reyes] and so she must know where they were."[1] Finally, Reyes Reyes's cell-phone

---

[1] Lincy testified that she called Reyes Reyes and Julieth to determine Diaz Martinez's whereabouts on the evening of Richard's murder because she "knew they were together." On direct examination, she testified that after she called Reyes Reyes and Julieth at "1:00" the morning of Richard's murder, Diaz Martinez came home, "but it wasn't so late." On cross-examination, Lincy testified that she called them to "find out where [Diaz Martinez] was or maybe where he had been" because "he didn't have his line turned on at that time." Finally, Lincy summarized the evening's events to defense counsel as follows:

> A  Okay. So I can say exactly -- okay. So the day that that kid died, all I can say is that I had gone back to Bryant [Alternative High School] with [Diaz Martinez].
>
> Q  That's all you can say?
>
> A  And just that after we went back home and after that [Reyes Reyes] came and he told us to go to a party.
>
>    After that we were home, and then I went inside the house and went to the bathroom, and [Diaz Martinez] went outside to smoke a cigarette. And after that I didn't see him again.
>
> Q  Then he came back later, he looked normal, he went to bed?
>
> A  Yeah. He looked normal. And I started calling other people because [Diaz Martinez] and I were angry and I wanted to know where he was.

data evidence showed that Reyes Reyes—whom Diaz Martinez admitted he had met up with on the night of the murder and whom Lincy testified was "always" with Julieth, who in turn was "always" with Diaz Martinez—was in the area of Bryant Alternative High School throughout the time of the murder.

This evidence represents material facts that connect Diaz Martinez to Richard's murder and corroborate "the occasion and opportunity for the crime" and thus, Julieth's accomplice testimony. *See Holmes*, 76 Va. App. at 57 (quotations omitted); *see also Dillard*, 216 Va. at 823 (quoting *Crosby v. Commonwealth*, 132 Va. 518, 520 (1922)). Diaz Martinez knew Reyes Reyes planned a "birthday party" and that he intended Julieth's participation in it. *See Clark v. Commonwealth*, 219 Va. 237, 243 (1978) (holding that an accused's own admissions may corroborate accomplice testimony). Lincy's testimony confirms that Diaz Martinez left his home in response to Reyes Reyes's invitation to "go to a party" and, coupled with Reyes Reyes's cell-phone data, supports the inference that he was with Reyes Reyes and Julieth at the time of Richard's murder. Although these facts, standing alone, are insufficient to support a conviction, they are sufficient to corroborate Julieth's accomplice testimony that Diaz Martinez was present during Richard's murder. Accordingly, the trial court did not err in refusing the cautionary jury instruction.

---

Lincy's testimony corroborates Julieth's testimony that Diaz Martinez was with Julieth and others at the time of the murder. Our dissenting colleague insists we must "disregard[] [Lincy]'s conflicting testimony that she called [Julieth] that night looking for" Diaz Martinez. This suggests an invocation of the appellate review principle that we "discard the evidence of the [Commonwealth] *in conflict* with that of the [accused]," *Cady*, 300 Va. at 329 (quoting *Perkins*, 295 Va. at 324). But Lincy's testimony presents no evidentiary conflict. Even in the light most favorable to Diaz Martinez, Lincy's testimony supports the inference that Diaz Martinez was with Reyes Reyes and Julieth—and *not* with Lincy—during the relevant period. To the extent favoring the jury instruction proponent requires discarding conflicting evidence, it does not compel disregarding evidence merely unhelpful to the proponent's position. Nonetheless, and for the reasons discussed above, there is sufficient corroboration of Julieth's testimony even without Lincy's testimony that she called *that night* looking for Diaz Martinez.

## II. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). In reviewing the sufficiency of the evidence, "[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

A. *First-Degree Murder*

Diaz Martinez argues that the evidence was insufficient to prove he committed first-degree murder under Code § 18.2-32 because he neither committed the acts resulting in Richard's death nor acted as a principal in the second degree. According to Diaz Martinez, the evidence was insufficient to prove that he was either present or engaged in any conduct that would make him an accomplice in the attack. Diaz Martinez stresses that Julieth's testimony did not confirm his precise role in the attacks and that no evidence proved that he participated in the attacks because Julieth's testimony did not attribute any conduct to him at all. Diaz Martinez also asserts that even if the evidence was sufficient to establish his presence at the scene of the crime, mere presence would not make him an accomplice to the crime.

1. Presence

Despite a defendant's statements regarding his whereabouts at the time a crime occurred, "[t]he fact finder need not believe the accused's explanation and may infer that he is trying to conceal his guilt." *Carter v. Commonwealth*, 223 Va. 528, 532 (1982) (quoting *Black v. Commonwealth*, 222 Va. 838, 842 (1981)). This is true even if the evidence establishing the accused's presence is circumstantial, for "[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983). Additionally, "[s]ince the fact finder had the opportunity of hearing and observing the witnesses, its findings are entitled to great weight." *Carter*, 223 Va. at 532.

Here, Julieth testified unequivocally that Diaz Martinez was present during Richard's murder, and, as explained in Section I, *supra*, Julieth's accomplice testimony was sufficiently corroborated by other evidence. In particular, the jury was entitled to weigh Lincy's testimony regarding Diaz Martinez's whereabouts on the night of the murder against Diaz Martinez's own explanation of his whereabouts and conclude that Diaz Martinez had lied to conceal his guilt. Considering Lincy's testimony that Diaz Martinez left his apartment with Reyes Reyes on the night of the murder and did not return home until after 1:00 a.m. the next morning, the jury could reasonably infer that Diaz Martinez's self-serving statement that he returned home at around 11:00 p.m. before Richard arrived was incredible. Moreover, considering Reyes Reyes's cell-phone data evidence—which showed that he was in the area of Bryant Alternative High School throughout the relevant time when the murder occurred—the jury could reasonably conclude that Diaz Martinez—who had initially joined up with Reyes Reyes to conduct the "birthday party"— was likewise with Reyes Reyes in the area of Bryant Alternative High School when the murder occurred.

In all, the jury could reasonably conclude that Diaz Martinez's explanation of his whereabouts at the time of Richard's murder was incredible and conflicted with the other evidence in the case. Thus, the evidence was sufficient to establish that Diaz Martinez was present during the commission of the murder.

### 2. Principal in the Second Degree

Under Virginia law, a principal in the second degree is "equally answerable and bound by the acts of every other person connected with the consummation of [a] . . . crime." *Winston v. Commonwealth*, 268 Va. 564, 602 (2004). A principal in the second degree "is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime." *Muhammad v. Commonwealth*, 269 Va. 451, 482 (2005) (quoting *Jones v. Commonwealth*, 208 Va. 370, 372 (1967)). "[A] defendant is guilty as a principal in the second degree if he is guilty of some overt act done knowingly in furtherance of the commission of the crime, or if he shared in the criminal intent of the principal committing the crime." *McMorris v. Commonwealth*, 276 Va. 500, 505 (2008). For a defendant to be liable as a principal in the second degree, "actual participation in the commission of the crime is not necessary." *Muhammad*, 269 Va. at 482 (quoting *Jones*, 208 Va. at 372).

Generally, "[m]ere presence during the commission of a crime is not sufficient to render one criminally liable." *Rollston v. Commonwealth*, 11 Va. App. 535, 542 (1991). However, "accompanying a person with full knowledge that the person intends to commit a crime and doing nothing to discourage it bolsters the perpetrator's resolve, lends countenance to the perpetrator's criminal intentions, and thereby aids and abets the actual perpetrator in the commission of the crime." *Pugliese v. Commonwealth*, 16 Va. App. 82, 94 (1993). Hence, a person's presence during the commission of a crime without disapproving or opposing it is "evidence from which, in connection with other circumstances, it is competent for the jury to

infer that he assented thereto, lent to it his countenance and approval, and was thereby aiding and abetting the same." *Hampton v. Commonwealth*, 32 Va. App. 644, 648-49 (2000) (quoting *Foster v. Commonwealth*, 179 Va. 96, 100 (1942)).

We hold that the evidence was sufficient to support a jury finding that Diaz Martinez participated in Richard's murder as a principal in the second degree. First, Julieth's testimony established that Diaz Martinez committed an overt act in furtherance of Reyes Reyes's "birthday party" plan when Diaz Martinez initially joined the group in the woods and struck Richard with a blow. Julieth's testimony also established that, after hitting Richard, Diaz Martinez accompanied the group deeper into the woods, surrounded Richard along with Reyes Reyes and Estupinian as Richard was beaten to death, and took no actions to discourage or stop the other group members from carrying out the beating.

Additionally, "'other circumstances' were present in this case in addition to appellant's failure to disapprove or oppose the actions of the perpetrator[s]." *Hampton*, 32 Va. App. at 649. The evidence established that Diaz Martinez and Reyes Reyes convened prior to the murder to discuss Reyes Reyes's plan to conduct a "birthday party" and that Diaz Martinez knew that a "birthday party" consisted of the imposition of gang discipline on a person in the form of a beating. Expert testimony from Detective Betts also confirmed that a "birthday party" can be a planned attack to kill the target person. Therefore, the jury could find that Diaz Martinez knew beforehand of Reyes Reyes's criminal intent and shared Reyes Reyes's criminal intent by deliberately joining Reyes Reyes in the woods where the murder occurred.

Moreover, even if Diaz Martinez did not have the specific criminal intent to kill, "[t]he one exception [to the general requirement of shared criminal intent] exists when there was concert of action and the resulting crime, whether such crime was originally contemplated or not, is a natural and probable consequence of the intended wrongful act." *McMorris*, 276 Va. at 506.

Here, Diaz Martinez—with full knowledge of what a "birthday party" consists of and at the request of a high-ranking MS-13 member, Reyes Reyes—acted in concert of action with Reyes Reyes and the other group members by intentionally joining the group in the woods, initially striking Richard with a blow, accompanying the group deeper into the woods, and surrounding Richard with Reyes Reyes and Estupinian as Richard was beaten to death. And since Richard's death was a natural and probable consequence of the severe beating, Diaz Martinez is criminally responsible for Richard's murder as a principal in the second degree, regardless of whether he intended the murder or not.

B. *Criminal Street Gang Participation*

Diaz Martinez contends that the evidence was insufficient to support his conviction for criminal street gang participation under Code § 18.2-46.2 because Richard's murder was not gang-related. Diaz Martinez asserts that the conflict between Reyes Reyes and Richard was based on Reyes Reyes's jealousy of Richard's relationship with Julieth and that Richard's murder was not carried out in furtherance of any MS-13 gang activity.

"The offense of participating in a criminal street gang contains three elements that the Commonwealth must prove to sustain a conviction under [Code § 18.2-46.2]." *Hamilton v. Commonwealth*, 279 Va. 94, 108 (2010). "First, a person must actively participate in or be a member of a criminal street gang. Second, the person must knowingly and willfully participate in a predicate criminal act. Third, the act must be committed for the benefit of, at the direction of, or in association with the gang." *Id.*

On brief, Diaz Martinez does not dispute the first element that he actively participated in or was a member of MS-13. Diaz Martinez argues only that the second element was not established because he did not commit the predicate criminal act of first-degree murder and that the third element was not established because Richard's murder was not gang-related. Diaz

- 13 -

Martinez's argument as to the second element fails because, as explained in Section II.A, *supra*, the evidence was sufficient to establish that he committed first-degree murder as a principal in the second degree. Thus, this assignment of error concerns only the third element of criminal street gang participation.

As to the third element, Code § 18.2-46.2(A) requires that the predicate criminal act be committed "for the benefit of, at the direction of, or in association with any criminal street gang." Code § 18.2-46.2(A)'s "use of the disjunctive word 'or,' rather than the conjunctive 'and,' signifies the availability of alternative choices." *Morris v. Commonwealth*, 58 Va. App. 744, 749 (2011) (quoting *Bunch v. Commonwealth*, 225 Va. 423, 442 (1983)). Therefore, the Commonwealth can satisfy the third element solely by proving that a defendant committed a predicate criminal act "in association with" a criminal street gang. *Id.* at 749-50.

Here, the evidence was sufficient to establish that Diaz Martinez's participation in Richard's murder was done "in association with" the criminal street gang MS-13 because Diaz Martinez participated at the request of a high-ranking MS-13 member, Reyes Reyes, and the murder was carried out by MS-13 members in the form of a "birthday party," which is a type of MS-13 gang attack carried out on another person to impose discipline. Even if, as Diaz Martinez argues, the murder was not carried out for the benefit of MS-13 as a gang, that is of no moment. Code § 18.2-46.2(A)'s use of the disjunctive "or" for the third element of criminal street gang participation entails that the predicate criminal act need not necessarily have been done "for the benefit" of a criminal street gang, so long as the predicate criminal act was done "in association with" a criminal street gang. Regardless of whether Richard's murder was carried out "for the benefit" of MS-13, the evidence sufficiently established that the murder was carried out "in association with" MS-13. Therefore, we hold that the evidence was sufficient to convict Diaz Martinez of criminal street gang participation.

CONCLUSION

The evidence was sufficient to establish that Diaz Martinez committed first-degree murder as a principal in the second degree, and the evidence was also sufficient to establish that Diaz Martinez participated in a criminal street gang.  Additionally, the trial court did not err in denying Diaz Martinez's proposed cautionary jury instruction.  Accordingly, the trial court's judgment is affirmed.

*Affirmed.*

Chaney, J., concurring in part, dissenting in part, and dissenting from the judgment.

I agree with the majority that the evidence is sufficient to sustain the convictions. However, under the applicable standard of review—considering the evidence in the light most favorable to the proponent of a refused jury instruction—I disagree with the majority's holding that the trial court did not abuse its discretion in refusing the defendant's proposed cautionary instruction regarding uncorroborated accomplice testimony. Therefore, I respectfully dissent from the majority's judgment affirming the convictions.

The murder case against Diaz Martinez (defendant) is based on the testimony of Julieth Ortega, an accomplice in the murder who had already pleaded guilty to second-degree murder. Ortega's plea agreement required her to testify against her alleged accomplices in the murder case. Ortega testified that she was "trying to earn good favor and receive a suspended sentence or a time-served sentence."

The defendant asked the trial court to give the jury the following cautionary instruction:

> Julieth Ford Ortega has testified that she was an accomplice in the commission of the crimes charged in the indictment. While you may find your verdict upon [her] uncorroborated testimony, you should consider such testimony with great care and you are cautioned as to the danger of convicting the defendant upon the uncorroborated testimony of an accomplice. Nevertheless, if you are satisfied from the evidence of the guilt of the defendant beyond a reasonable doubt, the defendant may be convicted upon the uncorroborated evidence of an accomplice.

This instruction is identical to Virginia's Criminal Model Jury Instruction 3.400, and the Commonwealth conceded that it is a correct statement of law. *See Via v. Commonwealth*, 288 Va. 114, 115 (2014) (recognizing that a near-identical jury instruction correctly stated the law regarding uncorroborated accomplice testimony).

"[I]f an accomplice's testimony is uncorroborated, it is error for a trial court to refuse the cautionary instruction." *Holmes v. Commonwealth*, 76 Va. App. 34, 55 (2022). "Whether the

- 16 -

accomplice testimony was sufficiently corroborated is a question of law . . . reviewed *de novo* on appeal." *Id.* at 56. "[I]n deciding whether a particular instruction is appropriate, we view the facts in the light most favorable to the proponent of the instruction." *Id.* at 53 (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)).

Taking the evidence in the light most favorable to the defendant as the proponent of the jury instruction, Ortega's testimony that the defendant was present participating in the murder was uncorroborated.

Defendant's Statements to Police

Considering the defendant's police interview in the light most favorable to the defendant, his statements to the police do not corroborate Ortega's testimony implicating him in the murder. Initially, the defendant claimed he had no information about the murder case and then stated that he didn't want to provide information and be considered "a rat" by other people. Subsequently, the defendant told police that Reyes Reyes told him about the plan to lure the victim into the woods and attack him. The defendant said he told Reyes Reyes that he could not stay because his girlfriend would be angry that he went out without her. Then, around 10:00 or 11:00 p.m., he returned to the apartment he shared with Lincy Flores and remained at home with her for the rest of the night.

The defendant stated that Reyes Reyes called him the next day and asked for his help. Subsequently, he met Reyes Reyes in the woods and helped him and two others dig a hole. Initially, the defendant denied seeing or touching the decedent. But he later admitted that he helped move the body into the hole. The defendant explicitly denied participating in the murder.

Taking the evidence in the light most favorable to the defendant, as required, the evidence does not support the trial court's inference that the defendant did not need instructions to the place where he admittedly assisted in burying the victim's body. This inference is based

on facts not in evidence. The record is silent on what, if anything, the defendant was told about the intended burial location before the defendant went there the day after the murder. And considering the evidence in the light most favorable to the defendant, he knew about the murder because Reyes Reyes told him about it, not because the defendant participated in the murder.

Lincy Flores's Trial Testimony and Phone Records

Contrary to the majority's contention, Lincy Flores's trial testimony and phone records—considered in the light most favorable to the defendant—do not corroborate Ortega's testimony that the defendant was present during the murder. Flores's trial testimony includes conflicting statements about the defendant's whereabouts at the time of the murder. Flores testified that she called Ortega around 1:00 a.m. looking for the defendant. According to this testimony, Flores did not know the defendant's whereabouts around the time of the murder, which occurred between 11:26 p.m. and 2:00 or 3:00 a.m. However, Flores also testified that the defendant left their apartment earlier that night and "it wasn't so late" when he returned. Flores further testified that *after* the defendant had returned to their apartment and "looked normal," she "started calling other people because [she and the defendant] were angry and [she] wanted to know where he was" when he went out earlier without her. When Flores's testimony is thus understood in the light most favorable to the defendant—disregarding Flores's conflicting testimony that she called Ortega that night looking for the defendant—the cell phone records showing that Flores called Ortega and Reyes Reyes after 1:00 a.m. do not corroborate Ortega's testimony that the defendant was with Ortega and Reyes Reyes at the time of the murder. The majority reaches the contrary conclusion without considering the evidence in the light most favorable to the defendant, contrary to the applicable standard of review.

- 18 -

CONCLUSION

Because Ortega's testimony implicating the defendant in the murder—considered in the light most favorable to the defendant—was uncorroborated, the trial court abused its discretion in refusing to give the jury the proposed cautionary instruction regarding uncorroborated accomplice testimony. Therefore, I would reverse the trial court's judgment, vacate the convictions, and remand for retrial. Accordingly, I respectfully dissent from the judgment affirming the defendant's convictions.