# COURT OF APPEALS OF VIRGINIA

## Record No. 0335-25-1

NASIR NESSHON THOMAS

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Atlee, Chaney and Bernhard

Argued at Norfolk, Virginia

Opinion Issued June 9, 2026[*]

## FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge

John O. Venner for appellant.

Craig W. Stallard, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE DAVID BERNHARD

A jury convicted Nasir Nesshon Thomas of nine counts of maliciously shooting at an occupied vehicle, one count of second-degree murder by maliciously shooting at an occupied vehicle, resulting in death, one count of participating in maliciously shooting at an occupied vehicle resulting in death in association with a criminal street gang, and one count of use of a firearm in the commission of a felony. The circuit court sentenced Thomas to 73 years, with 5 years suspended. On appeal, Thomas contends the court violated his confrontation right by prohibiting full cross-examination of the Commonwealth's principal witness, Taeshon Johnson ("T.J."), about his juvenile criminal record and that the evidence was insufficient to sustain each conviction. For the

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

reasons discussed below, this Court holds Thomas's Confrontation Clause claim is unpreserved and inadequately briefed, and the evidence supports the jury's verdict on each conviction. Consequently, the judgment of the circuit court is affirmed.

BACKGROUND[2]

A jury trial was held on November 18-22, 2024. The Commonwealth's case rests on physical evidence and witness testimony, including from eyewitness T.J., who alleged that Thomas participated in the shooting on June 14, 2021, causing fatal injuries to D.R.K.[3]

I. T.J.'s Testimony About the June 14, 2021 Incident

On June 14, 2021, Malachi Handy, Thomas, and T.J. went to Grandy Park in Norfolk, Virginia, where they met Omari Green, Zion Urquhart, and Hassan Johnson. The group decided to go "smacking" in Virginia Beach, which involves "pulling on car door handles to . . . [remove items from] inside the car." Handy drove Thomas, Johnson, and T.J. in a gray Honda Civic, while Green rode with Urquhart and an unidentified person in a blue Honda HR-V.[4] Johnson, Handy, Green, Urquhart, and appellant were armed. T.J. testified that he gave his gun to Thomas "when [they] first got around each other" and that due to wearing an arm brace, T.J. could not hold the gun

---

[2] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Scott v. Commonwealth*, 292 Va. 380, 381 (2016). This standard requires the Court to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015).

[3] This opinion uses initials to protect the privacy of the victim.

[4] Both vehicles were alleged to have been stolen. T.J. indicated that Thomas, Johnson, and T.J. sat in the front passenger seat, behind the driver's seat, and behind the passenger seat, respectively.

or pull the trigger on June 14.[5]  Home security footage depicts masked individuals testing car handles at Gem Court in Virginia Beach.  T.J. identified Thomas and Johnson by their distinctive shoes—black and yellow Jordans (sneakers) and pink Crocs, respectively.

The group stopped "smacking" after a car alarm sounded.  T.J. alleged they were riding around when Green "flagged us down" to pull over and approached the gray Honda on foot.  Green then stated, "the ops out here," which T.J. described to the jury as "someone you got a beef with and somebody you got a disliking for."[6]  T.J. witnessed Thomas "in the front [seat] doing something with his . . . mask."[7]  Both vehicles proceeded down Weblin Drive, with the blue Honda turning onto Mooregate Court and the gray Honda making an abrupt U-turn.

At the same time, T.J. noticed a car "coming towards [them]."  He testified that Thomas and Johnson began rolling down their windows, with guns in hand.  Thomas extended "his upper half out of the car," in the direction of Mooregate Court, while Johnson "leaned up towards [T.J.]," also pointing his gun out of the window.  Believing "something was going to happen," T.J. "ducked down."  Gunfire erupted, lasting for "20 [to] 30 seconds."[8]  The group left and drove to a nearby cul-de-sac, where a joint conversation, excluding T.J., ensued.  T.J. alleged the group seemed "happy" after the encounter, stating they "heard the bullets whizzing past their heads" and "felt

---

[5] T.J. claimed his brother gave him a gun after he was shot in the arm on April 12, 2021. Medical records confirm T.J. was in therapy and did not have full range of motion in his hand as of June 14, 2021.

[6] T.J. replied "Yes, ma'am" to the Commonwealth's question, "Is [ops] a term that people in gangs use?"

[7] Subsequently, Thomas's mask was pulled up over his face, the same as "[w]hen we was smacking."

[8] Admitted home security footage showed three individuals exit a blue Honda and fire their weapons towards an undisclosed location.  T.J. identified two of the individuals as Green and Urquhart.

like John—James Bond." When asked about Thomas's demeanor, T.J. replied, "[h]e was just acting regular." The group returned to Grandy Park.

Dasharn Wright, a witness for the Commonwealth, alleged he was with D.R.K. on June 14, 2021.[9] Wright testified that he drove his father's vehicle to D.R.K.'s home near Gem Court to pick him up[10]; that Tajon Reese, Isajiah Brown, and D.R.K. were with him inside the vehicle; and that the vehicle was shot at "like a minute" after turning onto Weblin Drive.[11] In describing the initial moments, Wright stated, "I didn't really see a car until like, I just seen a U-turn." When asked about the kind of car, he said, "It was gray" and "I think it was like a Civic or something." Wright expressed that he "hopped out" of the vehicle "before . . . it stopped" and ran and hid behind a local 7-Eleven, along with Reese and Brown. He did not know D.R.K. had been shot at the time.

Tajon Reese confirmed he was with D.R.K. the night before his senior graduation. He testified he and Wright called D.R.K. and Brown to see "[i]f they wanted us to come pick them up," explaining the two were together at D.R.K.'s home.[12] He further testified that Wright's vehicle "turn[ed] left on Weblin" almost immediately after pulling off from said home. Reese asserted that he saw a vehicle ride past them and eventually slow down, stating, "So as the car hit a U-turn, all you heard was what happened." Calling the instance "a blackout moment," he recalled bowing his head for protection, even as he exited the vehicle. He indicated the victim's

---

[9] Wright shared that he and D.R.K. were friends and football teammates and indicated they were set to graduate from high school the next day (June 15, 2021).

[10] The only description for the victim's vehicle is that it was "a gold car."

[11] The Commonwealth asked about the number of gunshots heard; Wright replied, "I don't know. I don't really know" and "I couldn't say."

[12] Reese asserted the group did not drink or smoke that night and denied any gang affiliation.

vehicle ended up around a curb and in a court. When he saw Brown take off running, Reese followed, in the same manner. He was also unaware that D.R.K. had been shot.

Officer William Young, with the Virginia Beach Police Department, responded to a call for service near Weblin Drive and Mooregate Court on June 14, 2021. While investigating a home impacted by gunfire, he heard fellow Officer David Shoenbach report over the police radio that "he had a victim of a gunshot wound." When Officer Young arrived at the scene, he observed a male, later identified as D.R.K., "slumped over" in the backseat of a vehicle.

Officer Shoenbach testified he had located a gold Infiniti at Trafalgar Court. He found the car running with three doors open and its lights activated. Approaching the vehicle, Officer Shoenbach saw D.R.K. "slumped" in the backseat. He recalled a "heavy amount of blood" coming from the victim's mouth and the right side of his head. D.R.K. died at the hospital on June 22, 2021.[13] Detective Christopher Jachimiak, with the Virginia Beach Police Department, was qualified by the court as an expert in "call detail records, phone/cell phone data extraction, and geolocation analysis." He testified that the metadata associated with the cellular devices belonging to T.J. and Handy "puts . . . the devices at the vicinity of the shooting at the time."[14]

Brittany Porter and Kari Dodd, scientists with the Virginia Department of Forensic Science, were qualified as experts in forensic biology. Porter testified that Thomas was eliminated as a major contributor to the DNA evidence profiles sampled from door handles and a recovered Smith and Wesson handgun. Comparing the DNA profiles from Porter to those from other

---

[13] The autopsy report indicated death by a single gunshot wound to the head.

[14] No geolocation evidence was available for Thomas.

collected evidence,[15] Dodd testified that while Thomas was eliminated from major profiles for the magazines, he "could not be eliminated as the major contributor from the [1B4] cartridges."[16]

II. T.J.'s Testimony About the Spaz Gang[17]

T.J. testified that the "Spaz" gang formed after the death of Darnell Spaz in the summer of 2018. He claimed the group has a hand sign and gathers "[a]t the tree [Spaz] passed away at." T.J. testified that another gang, called "Siah World," formed as a subset of the Spaz gang. Members associate with the color purple and share a hand sign; although, T.J. claimed an individual "can be both" Spaz and Siah. Observing an admitted photograph, T.J. described Thomas as posing near the tree where Spaz passed away, wearing purple, and flashing "a Spaz."[18] In another photograph showing Thomas's Instagram credentials, T.J. stated Thomas was "[t]hrowing up a Spaz and a Siah." T.J. testified he "was just an associate [of the Spaz gang] because [he] didn't know [Spaz]," and as an associate, he had gone "smacking" with Handy, Urquhart, and Johnson "a decent amount of times."

Dustin Hansen, a City of Norfolk police officer, was confirmed by the court as an expert in gang activity. He testified the Spaz Gang was formed after Darnell Dedmon, nicknamed "D Spazo," was killed in a car crash. He noticed "patterns after that point," including "different clothing that would say things like Spaz[] Gang [or] Spaz[] World" and "consistent hand signs."

---

[15] A blood sample was recovered, and subsequently tested to create DNA profiles, from one magazine and nine cartridges, collectively identified as lab item 1B3, and one magazine and 14 cartridges, or lab item 1B4.

[16] Dodd explained the "probability of randomly selecting an unrelated individual who would match that major profile from the cartridges is approximately 1 in greater than 7.2 billion."

[17] The trial record references the name of the gang interchangeably as "Spaz" and "Spazz."

[18] The photograph also displayed "the dates [Siah] passed away" (May 10), whom the new gang is named after.

Hansen asserted that criminal activity was associated with the gang, such as "shooting in an occupied, robbery, stolen vehicles, [and] weapon offenses." Hansen testified the term "opps" is used in gang culture to describe "enemies," stating, "[a] lot of [the enemies of the Spaz gang] had to do with when individuals would disrespect Darnell Dedmon." Hansen claimed police reports indicated the gang had issues with certain people in Virginia Beach.

III. Cross Examination of T.J.

At trial, defense counsel sought to cross-examine T.J. about his juvenile criminal record, specifically a malicious wounding felony conviction, misdemeanor charges of credit card fraud, and the straw purchase of an illegal firearm conviction. Considering the admissibility of juvenile felony convictions, the court stated, in pertinent part,

> [T]he case of [*Thomas v. Commonwealth*, 279 Va. 131, 138 (2010)]. It's a pretty good discussion of the issue, and it says, quote, in the decade since [*Kiracofe v. Commonwealth*, 198 Va. 833, 844-45 (1957)], the United States Supreme Court has held that the confrontation clause requires that where pending juvenile proceedings support a defendant's specific effort to show bias or motive of a prosecution witness to give testimony favorable to the government in a particular case, the policy of privacy for juvenile records must give way to the need for effective cross-examination to show the bias of the witness.
>
> It goes on to note: However, with respect to general conviction impeachment, not intertwined with an effort by the defendant to show bias of a witness in the particular case based upon the circumstances of pending juvenile proceedings, the confrontation clause does not require disclosure or admission of juvenile records, and we are not persuaded that a change in our jurisprudence is necessary on this subject and take this opportunity to reaffirm that juvenile adjudications may not be used for impeachment of a witness on the subject of general credibility.

Defense counsel asserted, "I think this is critical impeachment of the Government's main witness in this case, and I think it's got to give way to the Sixth Amendment, the right of effective representation and cross-examination." He added, "I should at least be able to ask [T.J.] if he's a

convicted felon, that he's got a credit card—he's got a lying, cheating, stealing misdemeanor; he's got a felony straw purchase of a gun."

The Commonwealth opposed the request, contending the firearm charge would be disclosed on direct, and the credit card fraud and "the fact that he was convicted as a juvenile" were "completely irrelevant" to put before the jury. In response, defense counsel said, "Judge, I might be saying -- regarding this malicious wounding charge, maybe the Government's looking at the wrong person at the end of this case." The court sustained the Commonwealth's objection, stating to defense counsel, "I understand your arguments; I find them to be logical, cogent, and persuasive, but I'm not in a position to butt heads with the Virginia Supreme Court."[19] The judge noted an objection from defense counsel to this ruling.

On cross-examination, T.J. admitted he had known Thomas for approximately six months prior to June 14, 2021. He further admitted that his brother gave him a gun in April 2021, that he carried the gun "almost every day" between April 2021 and June 2021, that Thomas handled the gun a few times, including several days prior to the date in question, and that T.J. gave the gun to Thomas on June 14, 2021. Defense counsel claimed T.J. had "lied" to authorities in November 2022, when stating, "[he] didn't know anything about the gun." T.J. eventually conceded, explaining that he "was still trying to make light of the situation." Defense counsel then asked

---

[19] The court provided leeway for defense counsel to renew his cross-examination request. The court stated, "You want [T.J.'s] criminal record to be admitted?" to which defense counsel answered, "I really do. And . . . now, I've taken a look at possession of a firearm by a convicted felon." Continuing, defense counsel argued,

> it specifically states that, you know, if you're convicted of a felony
> as a juvenile, which would otherwise be an adult felony, then you
> qualify as a convicted felon by, you know, possession of a firearm
> by a convicted felon. So they're alluding to the exact thing I would
> like to get into, that is juvenile convictions that would be a
> predicate offense for possession of a firearm by a convicted felon,
> which he hadn't been charged with. He was charged with buying
> a—a felon buying a gun by a juvenile.

T.J. if he had been charged with a felony at that time, to which T.J. replied, "I . . . got charged with the firearm." T.J. stated he went "smacking" "approximately ten [times]" and received criminal charges but clarified that he was not prosecuted in connection with June 14, 2021. T.J. further acknowledged he did not disclose the incident until he was arrested by law enforcement on straw firearm charges in November 2022, roughly 15 months later.

IV.  The Trial

After the Commonwealth rested its case, Thomas moved to strike the evidence. The circuit court denied the motion. Thomas elected not to testify; he presented Darrlyana Jones as an alibi defense. Jones testified that she and Thomas lived at the same address and that Thomas was home between 11:00 p.m. and 11:30 p.m. on June 14, 2021. On cross-examination, Jones conceded that photographic evidence shows Jones at a local 7-Eleven at 11:05 p.m. on said night. Jones further admitted that she read her alibi to three individuals, including Thomas's mother and her mother, "to make sure it sounded good" and confirmed the following recorded phone conversation: "when [your mother] said, [']I don't know nothing about that day, what was going on['] and you said, [']Honestly, I don't either, and I'm just going.[']"

The trial court denied the renewed motion to strike, and the jury found Thomas guilty of the criminal offenses of maliciously shooting at an occupied vehicle (nine counts), second-degree murder by maliciously shooting at an occupied vehicle, resulting in death, participating in maliciously shooting at an occupied vehicle resulting in death in association with a criminal street gang, and use of a firearm in the commission of a felony. Defense counsel unsuccessfully moved to set aside the verdicts. The circuit court imposed a total sentence of 73 years, with 5 years suspended. Thomas appealed.

ANALYSIS

*I. Thomas waived his Confrontation Clause claim because it was not properly presented to the circuit court.*

The Sixth Amendment provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The U.S. Supreme Court has long held that "a primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315 (1974). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316. At the trial court's discretion, a cross-examiner may impeach, or discredit, a witness with evidence of a prior criminal conviction. *Id.* When a conviction is used to impugn a witness's character as a truthful person, the introduction constitutes a "general attack" on credibility. *Id.* "A more particular attack . . . is effected by means of cross-examination directed toward revealing *possible biases, prejudices, or ulterior motives of the witness* as they may relate directly to issues or personalities in the case at hand." *Id.* (emphasis added). Virginia precedent bars the use of juvenile adjudications for general impeachment purposes, leaving open its use for specific attacks on credibility. *Thomas*, 279 Va. at 154-55; *see also Bostic v. Commonwealth*, 31 Va. App. 632, 634 (2000).

Thomas contends the circuit court violated his confrontation right to fully cross-examine T.J. about his serious juvenile criminal convictions, "all of which would have shown [T.J.] may well have been the perpetrat[or] of the crimes and his bias in this trial." At oral argument, Thomas's counsel acknowledged that bias was not explicitly raised before the circuit court, asserting instead that it was argued indirectly and that such indirect invocation suffices to preserve the issue for appeal. This Court disagrees.

At trial, defense counsel sought to introduce T.J.'s convictions for malicious wounding, credit card fraud, and straw firearm purchase. When the circuit court quoted the *Thomas* decision as grounds to deny admission, specifically noting the distinctions between the use of juvenile

- 10 -

adjudication evidence for bias and general impeachment, and citing that "juvenile adjudications may not be used for impeachment of a witness on the subject of general credibility," defense counsel stated, in relevant part:

> I think this is critical impeachment of the Government's main witness in this case, and I think it's got to give way to the Sixth Amendment, the right of effective representation and cross-examination. I should at least be able to ask him if he's a convicted felon, that he's got a credit card—he's got a lying, cheating, stealing misdemeanor; he's got a felony straw purchase of a gun.

Defense counsel further asserted, "Judge, I might be saying -- regarding this malicious wounding charge, maybe the Government's looking at the wrong person at the end of this case." Considering the totality of arguments advanced at trial, Thomas, through his counsel, did not argue that bias constitutes a proper basis for impeachment under the Confrontation Clause nor did he make clear that he intended to admit T.J.'s juvenile criminal convictions on cross-examination to show bias of the witness.

Rule 5A:18 requires that a circuit court be given a meaningful opportunity to rule on an objection. *Harless v. Williams*, 84 Va. App. 242, 257-58 (2025) ("The purpose of Rule 5A:18 'is to ensure that litigants "make timely and specific objections, so that the trial court has an opportunity to rule intelligently on the issues presented, thus avoiding unnecessary appeals and reversals."'" (quoting *Hannah v. Commonwealth*, 303 Va. 106, 124-25 (2024))). Because bias was not properly invoked in the lower court, and Thomas did not raise the "good cause" or "ends of justice" exceptions to Rule 5A:18, this Court declines to consider the argument for the first time on appeal. *Laney v. Commonwealth*, 76 Va. App. 155, 164 (2022).

Independently, even were the claim preserved, any error in limiting cross-examination of T.J. about his juvenile adjudications would be harmless beyond a reasonable doubt. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (holding that Confrontation Clause errors are subject to

constitutional harmless error review).  In assessing harmlessness, courts consider the importance of the witness's testimony, whether the testimony was cumulative, the presence or absence of corroboration or contradiction on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case.  *Id.*  Here, T.J. served as a key prosecution witness, providing the only eyewitness account of Thomas's actions in the shooting on June 14, 2021.  The jury was fully informed of T.J.'s prior inconsistent statements, his delayed disclosure to authorities, and his non-prosecution for the events of June 14, 2021, the most significant bases for impeachment, and nonetheless credited his account.  Moreover, T.J.'s testimony was extensively corroborated by geolocation data placing his and Handy's cell phones at the scene, DNA evidence connecting Thomas to cartridges recovered from the shooting, Wright's and Reese's independent accounts of a gray Honda Civic executing a U-turn before the gunfire, the autopsy confirming D.R.K.'s death by gunshot, and the destruction of Thomas's alibi defense.  On this record, there is no reasonable probability that admission of T.J.'s juvenile adjudications would have produced a different verdict.  Accordingly, the first assignment of error asserting violation of Thomas's right to fully confront T.J. is unpreserved and, in any event, without merit.

## II. The evidence is sufficient to support each of Thomas's convictions.

Consistent with settled appellate principles, "[a] conviction will not be disturbed on appeal unless the judgment is plainly wrong or without evidence to support it." *Durham v. Commonwealth*, 303 Va. 310, 326 (2024).  The controlling question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Chavez v. Commonwealth*, 69 Va. App. 149, 161-62 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

As an initial matter, Thomas's principal attack on sufficiency rests on the claim that T.J. was not a credible witness. This argument cannot succeed on appellate review. "[I]t is the province of the jury, rather than an appellate court, to weigh the facts and to judge the credibility of the various lay and expert witnesses." *Commonwealth v. Presley*, 256 Va. 465, 470 (1998). Thus, credibility determinations are awarded deference, unless the reviewing court finds the witness's testimony "inherently incredible, or so contrary to human experience or to usual human behavior as to render it unworthy of belief." *Willis v. Commonwealth*, 218 Va. 560, 563 (1977).

T.J.'s testimony falls short of that threshold on account of the several layers of corroboration. Significantly, the jury heard the full extent of T.J.'s prior inconsistent statements[20] and his non-prosecution and still found him credible. *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (explaining a fact finder may "resolv[e] conflicts in a single witness'[s] testimony, accepting that part of the testimony it deems credible and rejecting the portion it deems incredible"). The jury's rejection of Thomas's alibi defense provides further support: the record shows that alibi witness Darrlyana Jones rehearsed her testimony with Thomas's mother and acknowledged in a recorded phone conversation that she did not herself know what occurred on the night in question; fabrication of an alibi is itself evidence from which a jury may draw an inference of consciousness of guilt. Consequently, the Court will regard as true T.J.'s testimony.

A. *Second-Degree Murder by Maliciously Shooting at an Occupied Vehicle, Resulting in Death*

Code § 18.2-154 states, in relevant part,

> Any person who maliciously shoots at . . . any motor vehicle . . . when occupied by one or more persons, whereby the life of any person . . . in such motor vehicle . . . may be put in peril, is guilty of a Class 4 felony. In the event of the death of any such person, resulting from such malicious shooting . . . the person so offending is guilty of murder in the second degree. However, if the homicide

---

[20] T.J. conceded he initially told the police he did not know anything about the gun, and confirmed that he was not prosecuted in connection with the events on June 14, 2021.

- 13 -

is willful, deliberate, and premeditated, he is guilty of murder in the first degree.

Accordingly, to constitute murder under the statute, the Commonwealth must prove five elements beyond a reasonable doubt: "the accused committed (1) a malicious shooting, (2) at or against a motor vehicle, (3) when occupied by one or more persons, (4) whereby the life of any person in such motor vehicle may be put in peril, and (5) the death of any such person results therefrom." *Willis v. Commonwealth*, 10 Va. App. 430, 441-42 (1990). As to the requisite intent, this Court held that "the Commonwealth must prove beyond a reasonable doubt that the accused *intended to shoot at* or toward an occupied vehicle." *Armstead v. Commonwealth*, 55 Va. App. 354, 362 (2009) (emphasis added).

Here, T.J. alleged he traveled to Virginia Beach in a gray Honda Civic with Handy, Thomas, and Johnson on June 14, 2021,[21] accompanied by Green, Urquhart, and an unidentified person in a separate vehicle (a blue Honda HR-V). T.J. testified he gave his gun to Thomas at the outset of the evening and that an arm brace prevented his ability to hold the gun or pull the trigger. Medical documentation denotes T.J. was in active therapy and lacked full range of motion in his hand. T.J. further testified that after Green stated, "the ops out here," he observed Thomas "in the front [seat] doing something with his . . . mask"; that the vehicles proceeded down Weblin Drive and the gray Honda made a U-turn; that he saw a vehicle "coming towards [them]"; that Thomas extended "his upper half out of the car" window, identical to Johnson;[22] and that gunshots rang out for "20 [to] 30 seconds" before the vehicles fled the scene.

---

[21] T.J. testified the group went to Virginia Beach to go "smacking." Home security footage showed masked individuals testing car door handles; T.J. identified Thomas and Johnson by their shoes.

[22] Admitted video footage showed three individuals exiting a blue Honda, armed, and discharging their firearms. T.J. recognized Green and Urquhart in the video.

Wright testified that he drove his father's vehicle (a gold car) onto Weblin Drive after picking up D.R.K. In total, the car held Wright, Reese, Brown, and D.R.K. Wright claimed "see[ing] a U-turn" by a vehicle, which he later described as a "gray car" and "like a Civic or something," and hearing multiple gunshots. Wright further testified that he "hopped out" of the vehicle "before . . . it stopped" and ran away, along with Reese and Brown. Reese testified that he saw a vehicle ride past them and then slow down, stating "as the car hit a U-turn, all you heard was what happened," referring to the gunshots fired. He attested the victim's vehicle kept moving and eventually ended up around a curb and in a court. Geolocation records place T.J.'s and Handy's cell phones at the vicinity of the shooting.

Moreover, law enforcement officers located a gold Infiniti vehicle near Weblin Drive and Mooregate Court and found D.R.K. "slumped" in the vehicle's backseat. D.R.K.'s autopsy report confirmed death by a head gunshot wound. And Dodd, a forensic biology expert, testified that Thomas could not be eliminated as a major contributor to the DNA profiles taken from a recovered set of 14 firearm cartridges, with the probability of randomly selecting an unrelated matching individual at approximately one in greater than 7.2 billion. Examining the evidence in the light most favorable to the Commonwealth, a jury could reasonably infer Thomas was among those who fired at the vehicle carrying Reese, Brown, Wright, and D.R.K., who subsequently died from sustained injuries. Therefore, this Court finds no error in Thomas's conviction for second-degree murder. Because the elements of maliciously shooting at an occupied vehicle under Code § 18.2-154 are necessarily subsumed within the greater offense of second-degree murder under that same statute, the Court thus affirms the jury's verdict on each of the nine counts.

### B. *Participating in Maliciously Shooting at an Occupied Vehicle Resulting in Death in Association with a Criminal Street Gang*

Code § 18.2-46.2(A) provides:

> Any person *who actively participates in or is a member of a criminal street gang* and *who knowingly and willfully participates in any predicate criminal act* committed for the benefit of, at the direction of, or *in association with* any criminal street gang shall be guilty of a Class 5 felony.

(Emphases added). "The term 'predicate criminal act' is defined as, among other things, an 'act of violence' as described in Code § 19.2-297.1(A), including first and second degree murder, robbery," and certain controlled substance offenses. *Salcedo v. Commonwealth*, 58 Va. App. 525, 537 (2011).

The record on appeal establishes that the Spaz gang formed after the death of Darnell Dedmon, nicknamed "Spaz" or "D Spazo," and that members show their affiliation through clothing, a hand sign, and a unique location: "the tree [where Dedmon] passed away." Detective Hansen, an expert in gang culture, testified the Spaz gang is associated with different criminal activity, including "shooting in an occupied, robbery, stolen vehicles, [and] weapon offenses." "Siah World" is a subset of the Spaz gang, and its members are known for their hand sign and the color purple; although, a person can be affiliated with both groups. T.J. identified Thomas in one social media post as wearing purple and flashing the "Spaz" hand sign in front of the "Spaz" tree; it also displayed the death date of Siah, whom "Siah World" is named after. Another post showing Thomas's Instagram name presents him "[t]hrowing up a Spaz and a Siah." T.J. alleged he went "smacking" with Handy, Urquhart, and Johnson on several occasions as an associate of the Spaz gang.

Turning to the events on June 14, 2021, T.J. claimed Thomas was armed and responded to Green's comment, "the ops [are] out here," by pulling his mask, the same one allegedly used when "smacking" cars, over his face. T.J. and Hansen contended the word "*ops*" is used by gangs

to describe "someone you got a beef with" and "enemies," respectively. T.J. testified that he saw Thomas extend himself from the car window, with a firearm in hand, moments before the shooting and that gunshots rang out for "20 [to] 30 seconds." "[T]he testimony of a single witness, if found credible by the trial court and not found inherently incredible by this Court, is sufficient to support a conviction." *McCary v. Commonwealth*, 36 Va. App. 27, 41 (2001). DNA evidence further placed Thomas in contact with cartridges found at the scene. On this record, the Court cannot say, as a matter of law, that no rational jury could have found that Thomas shot at the victim's vehicle, resulting in the death of D.R.K., in association with the Spaz gang. Accordingly, there is sufficient evidence to support the conviction.

*C. Use of a Firearm in the Commission of a Felony*

Code § 18.2-53.1 reads, in pertinent part, "It shall be unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearm . . . while committing or attempting to commit . . . malicious wounding as defined in § 18.2-51." T.J.'s testimony, coupled with the DNA evidence, provides adequate support for Thomas's conviction. Consequently, the circuit court did not err in denying Thomas's motion and renewed motion to strike.

CONCLUSION

For the foregoing reasons, this Court affirms the circuit court's judgment.

*Affirmed.*